Johnny L. WATERS, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7600.

Court of Appeals of Alaska.

Feb. 14, 2003.

Paul E. Malin, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

W.H. Hawley, Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Johnny L. Waters was arrested for burglarizing the community store in Shungnak

and stealing approximately $16,000 from the store's safe. After spending a night in custody, Waters confessed to these crimes. He was subsequently convicted of second-degree burglary, second-degree theft, and second-degree criminal mischief.[1]

Waters now appeals his convictions and his resulting sentence. He first contends that his confession was involuntary. He next contends that the trial judge improperly restricted his cross-examination of an accomplice who testified as a government witness. Finally, Waters argues that his sentence (a composite of 10 years to serve) is excessive. For the reasons explained here, we reject these contentions and affirm the superior court's judgement.

### Underlying facts

Sometime during the night of April 10–11, 1999, the community store in Shungnak was burglarized. The burglars removed the safe from the store and, using a four-wheeler, transported it to a remote location. There, they chopped the safe open with an axe and removed its contents—approximately $16,000.

The next night, the Alaska State Troopers went to the residence of Johnny L. Waters and Jeffrey Sun to investigate their possible involvement in the burglary / theft. Troopers Richard Terry and Eric Olsen knocked on the door of the residence and were told to come in. Sun was on the couch in the front room. When the troopers asked who else was in the residence, Sun told them to find out for themselves. With guns drawn, the troopers proceeded to a bedroom where they discovered Waters resting with his girlfriend and daughter. Both Waters and Sun agreed to accompany the troopers to the village public safety building for questioning. This interview lasted approximately 30 minutes, and then both men returned home.

A few hours later, at approximately midnight that same night, the troopers arrested Waters and Sun and brought them back to the public safety building. After informing

Waters of his *Miranda* rights[2], the troopers questioned Waters about the burglary. Waters told the troopers that they were wasting their time because he did not plan to say anything. Despite Waters's apparent invocation of his right to remain silent, the troopers continued to question him for approximately 30 minutes. Waters did not make any incriminating statements during this time.

Following this interview, the troopers seized Waters's pants and coat as evidence, and then they placed him in a cell for the night. During the next half-hour, while the troopers interrogated Jeffrey Sun in the other holding cell, Waters repeatedly shouted to Sun, urging him not to tell the troopers anything.

The next day, however, Waters confessed his involvement in the burglary and showed the troopers where the safe was. Waters now claims that this confession was involuntary. This claim hinges on Waters's assertions that he had to endure torturous physical conditions in his cell and that, the next morning, the troopers promised him relief from his physical suffering and a visit with his family if he confessed.

### Waters's claim that his confession on the morning of April 12th was involuntary

In his suppression motion, Waters asserted that his cell was freezing cold and that the troopers left him there dressed only in his underwear. Waters claimed that he was unable to sleep because he was so cold. Waters also claimed that the troopers did not provide him with restroom facilities but rather made him relieve himself into a coffee can. Waters asserted that this physical discomfort and deprivation, combined with his extreme intoxication, reduced his normal powers of resistance. Waters also claimed that the troopers finally induced him to incriminate himself by promising him that he would be allowed to see his family if he confessed.

The superior court held a hearing to investigate these allegations. At this evidentiary hearing, the State introduced evidence to

---

1. AS 11.46.310(a), AS 11.46.130(a)(1), and former AS 11.46.482(a)(1) (pre–2002 version), respectively.

2. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

rebut Waters's claims. According to this testimony, the village public safety building had three heating vents, one of which was near the two holding cells. The officer in charge of the facility (the village public safety officer) covered the other two vents with duct tape, leaving most of the heat channeled into the holding cells. A trooper and the village public safety officer both described the building as "warm".

Waters's cell contained blankets. The two officers who guarded Waters that night testified that he initially paced his cell but then slept. Waters awoke in the middle of the night and asked for extra blankets and some aspirin. The village public safety officer honored both of these requests. Waters then slept for several more hours.

The evidence also showed that there was no plumbing in the village public safety building; thus, there were no restroom facilities for any occupant of the building—officers or prisoners. Both officers and prisoners used a coffee can for urination and a toilet in a nearby building for defecation.

The following morning, Waters's clothing was returned to him in preparation for his transportation to Kotzebue. At this time, Waters asked to call his girlfriend, and this request was granted. After speaking to his girlfriend, Waters asked to step out onto the porch to smoke a cigarette. Again, this request was granted; a state trooper (Eric Olsen) accompanied Waters.

While they were on the porch, Trooper Olsen remarked to Waters that he had finished his investigation of the burglary, that he knew who was involved, and that he felt sorry for Waters's daughter. In response, Waters expressed willingness to cooperate with the troopers, but only if he could see his family first.

The troopers took Waters home to visit with his family. Following this visit, Waters led the troopers to the safe and to where some of the missing coins were buried.

Based on the evidence presented at this hearing, Superior Court Judge Richard H. Erlich found (1) that Waters's cell was sufficiently heated; (2) that Waters was given an additional blanket at his request; (3) that Waters was moderately intoxicated but not extremely so; (4) that Waters did sleep; and (5) that Waters was the one who suggested that he would cooperate in exchange for a visit with his family. Having made these findings of fact, Judge Erlich concluded that Waters's confession was voluntary.

All of Judge Erlich's findings are supported by the evidence and are not clearly erroneous.

In this appeal, Waters supports his involuntariness claim with evidence that was developed at his trial. He is not entitled to do this. Although we have indicated that evidence developed at trial can be used to *support* the lower court's ruling on a pre-trial motion[3], such evidence can not be used to *attack* a pre-trial ruling unless the proponent of the motion affirmatively asks the trial judge to re-examine the pre-trial ruling in light of the newly-developed evidence. The lower court is the finder of fact—the one who decides issues of historical fact by assessing the credibility of witnesses and the weight of the evidence. An appellate court can not undertake these tasks in the first instance. Therefore, if a party believes that later-developed evidence has shown that the trial court's pre-trial findings are erroneous, it is that party's duty to apprise the trial court of the situation and affirmatively seek a re-determination of the pre-trial issue.

■ Waters argues that it is unfair to deny an appellant the right to attack a pre-trial ruling with evidence developed at trial. We disagree. The normal rule is that, absent plain error, a party challenging a trial court's ruling may not rely on an argument or on evidence that was not brought to the trial court's attention at the time the trial court made its ruling.[4]

---

**3.** *See Hubert v. State*, 638 P.2d 677, 680 n. 2 (Alaska App.1981).

**4.** *See Willis v. State*, 57 P.3d 688, 691–92 (Alaska App.2002) (explaining that "[u]nder Alaska Criminal Rule 46, an attorney does not preserve a claim of error unless, at the time of the ruling or order of the court is made or sought, [the attorney] makes known to the court the action which the party desires the court to take or the [attor-

Based on Judge Erlich's findings of fact, and based on our independent evaluation of the record concerning the inferences to be drawn regarding Waters's state of mind and the overall issue of voluntariness [5], we uphold Judge Erlich's ruling that Waters's confession was voluntary.

*Waters's claim that the trial judge improperly prevented Waters's attorney from cross-examining Jeffrey Sun about a prior criminal conviction*

■ Jeffrey Sun testified for the government at Waters's trial. In particular, Sun testified that he and Waters had been drinking together, that Waters had come up with the idea of burglarizing the store; and that he and Waters and two minors had perpetrated the burglary.

During the defense attorney's cross-examination of Sun, the following colloquy occurred:

> *Defense Attorney:* What you're saying is that, after this [trial] is done, [two of the three charges pending against you] are going to be dismissed?
>
> *Sun:* Yes.
>
> *Defense Attorney:* Those [charges] are going to be dismissed as part of an agreement that you've reached [with the State]?
>
> *Sun:* Yes.
>
> *Defense Attorney:* ... So you're not going to face three felony charges? ... You're going to face one?
>
> *Sun:* Yes.
>
> *Defense Attorney:* Okay, now. So you have a deal with the State?
>
> *Sun:* Yes.
>
> *Defense Attorney:* Now, you're familiar with the court system.
>
> *Sun:* No.
>
> *Defense Attorney:* Not at all?
>
> *Sun:* Not really.

At this point, Waters's attorney requested a bench conference. The defense attorney told Judge Erlich that he wished to introduce evidence that Sun had been convicted of an unspecified crime in 1989.[6] The prosecutor replied that a conviction from 1989 was 10 years old and was therefore not admissible under Alaska Evidence Rule 609(b). Judge Erlich thereupon ruled that Waters's attorney would not be permitted to question Sun about the 1989 conviction.

Under Evidence Rule 609(b), a witness may be impeached with a criminal conviction if the conviction (1) is for a crime of dishonesty and (2) is no more than 5 years old— although the trial judge has the authority to relax this 5 year time limit if evidence of the conviction "is necessary for a fair determination of the case". The record in Waters's case does not reveal what crime Sun was convicted of in 1989. Without proof that the conviction was for a crime of dishonesty, Waters has failed to show that Sun's conviction was admissible at all. Moreover, even assuming that Sun's conviction was for a crime of dishonesty, the conviction was 10 years old and Waters's attorney did not show that admission of this evidence was necessary for a fair trial.

In this appeal, Waters argues that Sun's 1989 conviction should have been admitted to establish Sun's bias in favor of the State. Specifically, Waters argues that, because Sun had a criminal record, Sun had particular need to strike a deal with the State. Waters also argues that, because Sun had prior dealings with the criminal justice system, he knew that testifying against Waters would help him at his own sentencing. But the record does not reveal that either of these theories of admissibility was presented to Judge Erlich.

---

ney's] objection to the action *and the grounds therefor.*") (emphasis in original).

5. *See John v. State,* 35 P.3d 53, 62 (Alaska App. 2001); *Beagel v. State,* 813 P.2d 699, 704 (Alaska App.1991) ("As to matters involving the accused's state of mind and the issue of voluntariness, this court will examine the entire record and make an independent determination.").

6. Although Waters argues in his opening brief that Sun's 1989 conviction was for burglary, the record does not reveal the nature of the 1989 conviction. Waters concedes this point in his reply brief.

Moreover, even if Waters's attorney had argued these theories of admissibility, the record does not suggest that evidence of Sun's 1989 conviction was necessary for a fair trial. As can be seen from the portion of Sun's cross-examination quoted above, Sun openly conceded that he was getting favorable treatment (a substantial reduction of the charges) in exchange for his testimony. The jury also heard that this reduction of charges had not occurred yet—that it would occur *after* Waters's trial, and that it was contingent on Sun's testimony. Thus, the jury understood Sun's potential motivation to frame his testimony with an eye toward securing Waters's conviction. Finally, Judge Erlich expressly instructed the jurors that they should view the testimony of an accomplice with mistrust. Waters fails to convincingly explain how evidence of Sun's 1989 conviction for an unspecified crime would have substantially altered the jury's understanding of Sun's motives for testifying as a government witness.

*Waters's sentencing claims*

 Waters was convicted of three offenses: second-degree burglary, second-degree theft, and second-degree criminal mischief—what would now be third-degree criminal mischief after the 2002 amendment to the criminal mischief statutes.[7, 8] Each of these offenses is a C felony, carrying a penalty of up to 5 years' imprisonment.[9]

Waters has an extensive criminal history. He was convicted of first-degree burglary in 1987 and 1988. In 1989, he was charged with second-degree weapon misconduct for shooting a .22–caliber rifle from his window while he was intoxicated, but this charge was dismissed after he admitted that this conduct violated his probation from the earlier offenses. In 1990, Waters was convicted of

third-degree assault for firing a rifle through someone's front window during an altercation. He was also twice convicted of burglarizing the Shungnak post office (where his mother worked) in 1990 and in 1992. Waters's history included a number of minor offenses as well—convictions for such things as underage drinking, providing alcohol to a minor, and fourth-degree theft (for stealing a bottle of liquor from someone's vehicle).

Because Waters had more than two prior felony convictions, he was a "third felony offender" for presumptive sentencing purposes[10] and he therefore faced a 3 year presumptive term for each crime.[11] Judge Erlich found that the State had proved three aggravating factors under AS 12.55.155(c): (c)(3)—that Waters was the leader of a group of three or more persons who perpetrated the offense; (c)(21)—that Waters had a history of similar criminal offenses; and (c)(27)(B)—that Waters was an adult (*i.e.,* someone older than 18) who was aided or abetted by a juvenile who was at least three years younger than him. Because of these aggravating factors, Judge Erlich was authorized to consider sentences of up to the maximum term of imprisonment.[12]

At the close of the sentencing hearing, Judge Erlich sentenced Waters to a composite term of 10 years' imprisonment. (Waters received 5 years to serve for the burglary, a consecutive 3 years to serve for the theft, and a consecutive 2 years to serve for the criminal mischief.) Waters claims that this composite sentence is excessive.

Waters first points out that, in Judge Erlich's sentencing remarks, the judge concluded that Waters was a "dangerous offender" within the meaning of Standard 18–4.4(c) of the American Bar Association's *Standards for Criminal Justice.*[13] Waters claims that

---

7. In 2002, the legislature created a new crime of first-degree criminal mischief and redesignated the three pre-existing degrees of criminal mischief accordingly. *See* SLA 2002, chapter 92, §§ 5–13.

8. Respectively, AS 11.46.310(b), AS 11.46.130(c), and former AS 11.46.482(b) (now re-lettered as 482(d)).

9. AS 12.55.125(e).

10. *See* AS 12.55.185(14).

11. *See* AS 12.55.125(e)(2).

12. *See* AS 12.55.155(a)(1).

13. According to this ABA standard, a "dangerous offender" is a person who has committed at least two prior felonies on different occasions within five years of the person's current offense, and who has previously served a sentence exceeding

he does not fall within the ABA's definition of "dangerous offender", but this question is ultimately beside the point.

Under older Alaska sentencing cases, a judge normally could not impose a sentence of 10 years or more unless the defendant fit the ABA's definition of "dangerous offender". But the Alaska Supreme Court disapproved this line of cases in *State v. Wentz*, 805 P.2d 962, 966 (Alaska 1991). Thus, Judge Erlich could sentence Waters to serve 10 years in prison without finding that Waters was a "dangerous offender" within the technical meaning assigned to this phrase in ABA Standard 18–4.4(c). Given the supreme court's decision in *Wentz*, the question is not whether Judge Erlich properly classified Waters as a "dangerous offender" under the ABA's definition. That question is moot. Instead, the question is whether Waters's history and the facts of his current offenses justify his sentence.

■ Nevertheless, Waters's case is still governed by the so-called *Mutschler* rule (even though the rule is more clearly stated in *Neal v. State*)—the rule that, before a judge imposes a composite sentence that exceeds the maximum term of imprisonment for the defendant's most serious single offense, the judge must expressly find that such a sentence is required to protect the public.[14] Judge Erlich did not make an express finding that a 10–year composite sentence was required to protect the public. Waters argues that, without an express finding, his sentence is improper. The State argues, on the other hand, that such a finding is implicit in the sentencing record.

Waters was thirty-one years old at the time of sentencing. He had battled an alcohol problem throughout his adult life. Judge Erlich found that Waters was the "mastermind" of the burglary and theft in the present case, and he noted that Waters had a lengthy history of felony and misdemeanor offenses. The judge also noted that Waters

failed to take advantage of numerous opportunities to reform his behavior. The judge declared that the people of Shungnak had been "subjected to [Waters's] terror for the last ten years".

It is true that Judge Erlich did not expressly address the *Neal-Mutschler* rule when he imposed the 10–year prison term. However, an express finding is not always required. In *Neal*, the supreme court declared that no express finding was needed under the following circumstances:

> The record contains ample evidence that [the defendant] presents a risk of continued criminal conduct which would seriously threaten the public safety. [The defendant] was twenty-nine years of age at the time of sentencing. He has been a heroin addict for ten years and has compiled a lengthy criminal record, including numerous felony and misdemeanor drug offenses and several property offenses. Extensive drug rehabilitation efforts have been a failure. With complete foresight [the defendant] helped to plan, organize, and carry out a highly dangerous and extremely serious crime [armed robbery of a bank]. It is clear that [the defendant] presents a threat of criminal conduct which would seriously threaten the public safety. Given his repeated rehabilitative failures and his conduct on this occasion, the threat is substantial.

*Neal*, 628 P.2d at 21.

These circumstances are quite similar to the facts of Waters's case. Waters, too, was a mature adult with a lengthy history of serious offenses and a seemingly intractable substance abuse problem. He was the prime mover behind a burglary that netted a large amount of money. Although Waters's present offenses (burglary, theft, and criminal mischief) are less serious than the armed robbery in *Neal*, his composite sentence of 10

one year. *See Williams v. State*, 800 P.2d 955, 959 n. 5 (Alaska App.1990).

14. *See Neal v. State*, 628 P.2d 19, 21 (Alaska 1981): "Our past decisions imply that where consecutive sentences for two or more counts exceed the maximum sentence for any single

count, the sentencing judge should make a formal finding that confinement for the combined term is necessary to protect the public." (Citing *Mills v. State*, 592 P.2d 1247, 1248 (Alaska 1979), and *Mutschler v. State*, 560 P.2d 377, 381 (Alaska 1977)).

years to serve is also less severe than the 18–year composite sentence involved in *Neal*.[15]

As was true in *Neal*, the sentencing record in Waters's case shows that he "presents a [substantial] risk of continued criminal conduct which would seriously threaten the public safety".[16] We therefore uphold Waters's composite sentence even though Judge Erlich failed to make an explicit finding under the *Neal-Mutschler* rule.

### Conclusion

The judgement of the superior court is AFFIRMED.

**15.** *See Neal,* 628 P.2d at 22.

**16.** *Neal,* 628 P.2d at 22.