**Sam W. McGEE, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–7697.

Court of Appeals of Alaska.

May 9, 2003.

---

8. *See* Op. at 422–423.

10. Op. at 423.

James M. Hackett, Law Office of James M. Hackett, Inc., Fairbanks, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

We remanded this case to the superior court for additional findings on whether the police had reasonable suspicion to test a package with ion mobile spectrometry.[1] Superior Court Judge Charles R. Pengilly found that the police did not have reasonable suspicion that McGee's package contained contraband when they removed it from the normal flow of commerce and tested it. The State does not challenge Judge Pengilly's factual findings but argues that his legal analysis was flawed. However, we agree with Judge Pengilly that under his findings the police did not have reasonable suspicion to remove the package from the normal flow of commerce to test it. Accordingly, we affirm Judge Pengilly's findings on remand and reverse McGee's convictions.

*Background facts and proceedings*

The police discovered the evidence against McGee after they intercepted a Federal Express package addressed to McGee and tested it with an Ion Track Instruments "Itemiser"—an ion mobility spectrometer. The Itemiser test revealed traces of a controlled substance. Based on this test result, the police obtained a search warrant to open the package. When the police opened the package, they found about seven ounces (200 grams) of cocaine. This discovery prompted further investigation and ultimately led to several charges against McGee.

McGee moved to suppress the evidence on several grounds but the superior court denied his motion. McGee entered a no contest plea to various counts of controlled substance misconduct while preserving his right to appeal the superior court's denial of his motion to suppress evidence.[2]

When the case was first before us, McGee raised several claims on appeal, but we addressed only one: We ruled that the police must have reasonable suspicion to temporarily remove a package from the normal flow of commerce and test it with the Itemiser. Be-

---

1. *See McGee v. State,* 51 P.3d 970, 971 (Alaska App.2002).

2. *See Cooksey v. State,* 524 P.2d 1251, 1255–57 (Alaska 1974).

cause the superior court did not address whether the police had reasonable suspicion, we remanded the case for additional findings. On remand, the superior court held an evidentiary hearing; the only witness was Anchorage Airport Police Officer Larry Tower who was assigned to the Statewide Drug Enforcement Unit.

On January 11, 1999, Officer Tower was at the Fairbanks Federal Express facility looking for packages containing drugs or contraband. Officer Tower removed McGee's package from the company's sorting process because he noticed that the airbill was addressed by hand. Tower looked closer at the package after removing it from the sorting area and noticed that the package was addressed to "Sam McGee." Tower concluded that the addressee was fictitious because he recalled "a legend of Sam McGee or something"[3] and the name struck him as "comical." Tower did not check to see if the name was fictitious. He also thought the package was suspicious because it was sent overnight delivery, the airbill did not include a phone number or a description of the contents, and the airbill had an indication that the $21.50 shipping charge was paid with cash. Tower testified that he felt a "container" inside the shipping envelope. He testified that Tacoma, Washington, the city where the package originated, is "one of the source cities ... that Alaska receives a lot of drugs from[.]" Tower then had the package tested with the Itemiser.

Judge Pengilly reviewed the testimony by the officer and made the following findings: he thought the package might have been "double packaged" as Tower testified; he found the package was shipped from Tacoma, but he rejected the contention that Tacoma was suspicious as a city where "most shipments of drugs to Alaska originate"; he found that the airbill was addressed by hand; he found the shipping charge of about twenty

dollars was paid in cash; and he found the officer thought McGee's name was fictitious, but did nothing to check his suspicion. Evaluating all these factors, Judge Pengilly concluded that Tower did not have reasonable suspicion to test the package.

*Did the police have reasonable suspicion to remove McGee's package from the normal stream of commerce and test it for controlled substances?*

■ In *Gibson v. State*,[4] we ruled that the police need reasonable suspicion of criminal activity before they can temporarily detain a package and subject it to sniffing by a drug detection dog.[5] In our earlier decision in McGee's case, we held this same rule applies when the police temporarily detain a package to test for controlled substances with the Itemiser.[6]

■ Whether the circumstances of a case establish reasonable suspicion is a mixed question of fact and law.[7] As the Alaska Supreme Court announced when discussing the reasonable suspicion standard:

[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.... And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? [8]

Judge Pengilly's factual findings are unchallenged. Judge Pengilly found that McGee's package might have been "double packaged." He found that the package was shipped from Tacoma but did not find that Tacoma was an important source city for drug shipments. He found the shipping charge of about twenty dollars was paid in cash and the airbill was hand written. He

---

3. *See The Cremation of Sam McGee,* a poem by Robert Service originally published in 1916.

4. 708 P.2d 708 (Alaska App.1985).

5. *Id.* at 709–11.

6. *McGee,* 51 P.3d at 971.

7. *Hayes v. State,* 785 P.2d 33, 36 (Alaska App. 1990).

8. *Coleman v. State,* 553 P.2d 40, 45 (Alaska 1976) (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)).

also found that the officer thought that McGee's name was fictitious. The question then is whether these facts would lead a person of reasonable caution to believe that McGee's package should be tested for controlled substances.

The fact that a FedEx overnight priority delivery package is "double packaged" means little because Federal Express requires that shippers use FedEx containers for their items or have the contents of their package cushioned on all sides with a minimum of two inches of protection.[9] A shipping charge of about twenty dollars for priority delivery from Tacoma to Fairbanks reflects the carrier's normal price range for priority delivery.[10] The State did not present evidence at the hearing before Judge Pengilly that these facts, in conjunction with the remaining facts about the package—the hand-addressed airbill, the cash payment for shipping from Tacoma, and the officer's subjective thought that McGee's name was comical and therefore fictitious—distinguished McGee's package from any small express package sent from one individual to another. The record provides no information to support a rational inference that the package contained contraband. Therefore, we agree with Judge Pengilly that the police did not have reasonable suspicion to test McGee's package with the Itemiser.

### Conclusion

We uphold Judge Pengilly's ruling that the police did not have reasonable suspicion to test McGee's package. Accordingly, we REVERSE McGee's convictions.

MANNHEIMER, Judge, concurring.

MANNHEIMER, Judge, concurring.

I am writing separately to highlight what I perceive to be the rationale of our decision.

The question presented is whether the police had reasonable suspicion to believe that the Federal Express package contained contraband when they removed the package from the normal stream of commerce and subjected it to an ion scanner. As we noted in *State v. Moran,* 667 P.2d 734 (Alaska App.1983), the concept of "reasonable suspicion" is "[n]ecessarily ... somewhat vague".[1] Nevertheless, in *Moran* we approved Professor Wayne R. LaFave's suggestion that "reasonable suspicion" means "a substantial possibility that criminal conduct has occurred, is occurring, or is about to occur".[2] We also quoted the formulation employed by the United States Supreme Court in *United States v. Cortez:*

> Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance [for resolving] the myriad factual situations that arise. But the essence of all that has been written [about "reasonable suspicion"] is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture[,] the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*Id.* (citing 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 628–29 (1981)).

The essential dispute in the present case involves the proper interpretation of this last-quoted sentence from *Cortez:* specifically, the meaning of the phrase "particularized and objective basis for suspecting ... criminal activity".

The State argues that the testimony presented to the superior court established particularized and objective reasons for suspecting that the package contained contraband: the person who shipped the package paid extra for overnight delivery; the shipping fee was paid in cash (rather than by check or credit card); the shipping envelope appeared to hold another container inside it; the ship-

---

**9.** *See* Terms and Conditions for Shipping within the United States at www.fedex.com/us/services/pdf/SG_Vol3_TermsCond.pdf?link=4 (last visited April 4, 2003).

**10.** *See* www.fedex.com/ratefinder/shipInfo (last visited April 4, 2003).

**1.** 667 P.2d at 735.

**2.** *Id.*

ping label was written by hand; and the shipment originated in a city from which many shipments of illicit drugs are sent to Alaska. According to the State, all of these articulated factors show that the police did not randomly pull the package out of the stream of commerce, but rather they acted on identifiable indicators that the package contained contraband.

But as Judge Pengilly suggested in his written decision, and as Judge Stewart suggests in this Court's lead opinion, the problem with the State's articulable factors is that they describe too many innocent shipments. As the United States Supreme Court stated in *Delaware v. Prouse*, the circumstances offered to validate an investigative stop must serve to differentiate the person stopped from the general public.[3] Likewise, the circumstances offered to justify the temporary detention of mail or mail-like articles shipped through commercial carriers like Federal Express and United Parcel Service must serve to distinguish the detained package from the general body of shipments.

I assume, for purposes of argument, that there is some reason to believe that packages shipped overnight are more likely to contain contraband than packages shipped on a slower delivery schedule. Likewise, I assume that there is some reason to believe that a package is more likely to contain contraband if the shipper pays the fee in cash, or addresses the package with a handwritten label. Finally, I assume that there are identifiable cities which are the origination points for a large number of drug shipments to Alaska. But if the Fourth Amendment to the United States Constitution and the search and seizure provision of Alaska's Constitution (Article I, Section 14) are to act as curbs to government intrusion, it is not enough for the State to point to identifiable reasons to suspect that a package contains contraband. The State's reasons must also serve to differentiate the suspected package from the body of innocent packages.

Doubtless, some ascertainable and predictable percentage of *all* mailings and commercial shipments contain drugs or other contraband. Thus, the State could properly assert that there is an identifiable, non-negligible possibility that *any* package, selected at random, will contain drugs. But if people are to have any privacy in the letters and packages they send, this fact can not serve as a justification for subjecting all mailings to government scrutiny.

In the present case, the factors that the State relies on to justify its seizure and search of the package describe too many innocent mailings. As Judge Stewart points out in his opinion, Federal Express normally requires all persons to use the company's shipping envelopes (even when the item being shipped is already enclosed in a container). Thus, the fact that McGee's package may have been "double packaged" does not differentiate it from a great number of other Federal Express shipments. The same is true regarding the fact that the shipping label was handwritten and the fee was paid in cash. One could reasonably expect to find handwritten labels affixed to most of the packages shipped by individuals and businesses who do not routinely ship items through express commercial carriers. Moreover, since the standard fee for express delivery is slightly over $20, one could expect that many of these people would pay in cash. Finally, as Judge Pengilly pointed out, the fact that a large number of drug shipments come to Alaska from Tacoma, Washington is unremarkable if, overall, a similarly large percentage of *all* shipments to Alaska come from Tacoma.

In other words, if we allowed the State to temporarily seize packages and subject them to ion scanning based on the factors offered in the present case, we would potentially be authorizing wholesale government seizure and inspection of the majority of envelopes and packages shipped by individuals and small businesses. Such a result would be at odds with the constitutional guarantees of privacy embodied in the search and seizure clauses of our federal and state constitutions.

One might argue that there is no need for alarm, since the physical intrusion is minimal (no physical opening of the package, and only a slight delay in its shipment), and since the

---

**3.** 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660, 672 (1979).

ion scanning device is designed to detect only drugs and explosives. But we live in an age when someone who wishes to know another person's words and activities need not engage in physical intrusion to discover them. Technological advances have given us devices that "see" through opaque containers and through the walls of residences, devices that can pick up and record conversations in another building, devices that can scan the contents of e-mails as they move across the Internet—even devices that can detect and record each of my keystrokes as I compose this concurring opinion.

If the government were free to use such devices to investigate its citizens based on the sorts of factors presented in this case, the result would be a significant chilling of personal and political discourse. As our supreme court noted in *State v. Glass,*

> In a pluralistic society dedicated to liberal democratic traditions, confidential communication serves as a lubricant for the smooth functioning of social and political institutions. Without "uninhibited, robust, and wide-open" public and private expres-

sion on the great issues of our day, as well as private discussion about the mundane, the trivial, and the banal, a once free society will soon become a nation of "hagridden and furtive" people.

583 P.2d 872, 877 (Alaska 1978).[4]

In *Glass,* our supreme court perceived—and took action to protect Alaska society against—"[t]he corrosive impact of warrantless participant monitoring on our sense of security and freedom of expression".[5] The present case does not involve electronic monitoring of speech, but rather electronic scanning of the contents of the letters and packages we mail to each other. And yet the adverse consequences of unrestrained government intrusion would be similar. For these reasons, I join in this Court's decision.

---

4.  Quoting Judge Hufstedler's dissent in *Holmes v. Burr,* 486 F.2d 55, 65–66 (9th Cir.1973).

5.  *Glass,* 583 P.2d at 877.