NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska  99501*
*Fax:  (907) 264-0878*
*E-mail:  corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| VLADIMIR A. BOCHKOVSKY,<br><br>     Appellant,<br><br>   v.<br><br>STATE OF ALASKA,<br><br>     Appellee. | Court of Appeals No. A-11100<br>Trial Court No. 3PA-10-1771 CR<br><br><br>O P I N I O N<br><br><br>No. 2471 — August 28, 2015 |

Appeal from the Superior Court, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances:  Hanley Smith, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions & Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before:  Mannheimer, Chief Judge, Allard, Judge, and Matthews, Senior Supreme Court Justice.[*]

Senior Justice MATTHEWS, writing for the Court.
Judge MANNHEIMER, dissenting.

    Vladimir A. Bochkovsky was convicted after a jury trial of misconduct involving a controlled substance in the second degree in violation of AS 11.71.020(a)(1)

---

  [*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

(possession of oxycodone with intent to deliver). At sentencing, the superior court rejected a proposed mitigating factor that the offense involved a small quantity of drugs and sentenced Bochkovsky to 6 years of imprisonment. On appeal, Bochkovsky contends that: (1) a state trooper lacked reasonable suspicion to subject a drug-containing package to a canine sniff; (2) there was insufficient evidence that Bochkovsky intended to deliver the oxycodone; and (3) the superior court erred in rejecting the "small quantities" mitigator. We conclude that none of these contentions has merit and affirm.

*Summary of facts and proceedings*

In July 2010, a FedEx manager in Wasilla contacted the Alaska State Troopers about a package he believed was suspicious. The troopers also thought the package was suspicious and had a trained dog sniff it in the FedEx offices. When the dog alerted, a trooper obtained a search warrant, opened the package, and discovered that it contained 129 OxyContin pills disguised as rolls of candy inside a cellophane bag. Subsequently, the troopers prepared a substitute package for delivery. They put only one of the OxyContin pills in the new package along with some candy and the rest of the contents of the original package. They also equipped the new package with an electronic device that would emit a signal when the package was opened.

The troopers obtained another warrant to search the residence where the package was to be delivered. When the package was delivered, Bochkovsky answered the door and accepted delivery. Shortly after delivery, the electronic device sounded and the troopers knocked on the door of the residence. When no one answered, they forced their way in and found Bochkovsky in a bedroom with the opened package and its contents on the floor.

Prior to his trial, Bochkovsky moved to suppress the contents of the package on the ground that the troopers lacked reasonable suspicion to subject it to a dog sniff. After an evidentiary hearing, the superior court denied the motion.

A jury then convicted Bochkovsky of second-degree misconduct involving a controlled substance[1] on the theory that he possessed the oxycodone (the active ingredient in OxyContin) with intent to deliver and fourth-degree misconduct involving a controlled substance[2] on the theory that he possessed any amount of oxycodone. The superior court merged the two counts at sentencing.

Bochkovsky asked the sentencing court to impose a mitigated sentence because there was only one OxyContin pill in the package at the time he was apprehended.[3] He also proposed the "least serious conduct" mitigator[4] and the "minor harm" mitigator.[5] The sentencing court rejected the proposed mitigating factors and sentenced Bochkovsky to 6 years to serve, a sentence within the presumptive range of 5 to 8 years for a first felony offender.[6]

Bochkovsky appeals.

*Facts concerning Bochkovsky's package and the canine sniff*

The package, a cardboard box supplied by FedEx, was taped shut, but not all the seams were sealed. A FedEx airbill was taped to the top indicating that the

---

[1]   AS 11.71.020(a)(1).

[2]   AS 11.71.040(a)(3)(A).

[3]   *See* AS 12.55.155(d)(13).

[4]   AS 12.55.155(d)(9).

[5]   AS 12.55.155(d)(12).

[6]   *See* AS 12.55.125(c)(1).

recipient was Mikey Sheeby of 341 East Heather Way, Apartment 1, Wasilla. The sender's name was Mark Vu of 3111 132nd St. SE, Apartment A104, Everett, Washington, and a phone number was listed. The airbill was filled out by hand. It called for next-day delivery. The sender paid $67.98 in cash to ship the package. The package was sent from a Kinko's/FedEx facility in Everett, Washington, on July 1, 2010.

Trooper Mike Ingram was dispatched to FedEx in Wasilla after a manager identified the package as suspicious. Ingram had been assigned to the Mat-Su narcotics unit for some six and a half years and had received substantial training in narcotics investigations, including "drug interdictions via commercial modes of transportation." Based on this training and experience, Ingram looked for "key indicators" on packages that have a "high probability of having drugs."

Ingram noted several indicators that led him to suspect that this package contained drugs. The package had a handwritten label, which indicated that it was probably not a commercial shipment, which constituted most of FedEx's business. The shipment was paid in cash and had been sent by next day air, which is relatively expensive — $67.98 in this case. Ingram found this factor "pretty significant" because "[w]e know that individuals [who] are shipping drugs through commercial modes ... often pay cash because the items inside are more valuable than the money they're [spending] to have a speedy delivery of that package." The shipment was also made at a "[Kinko's] FedEx copy, which is basically a drop-box I believe at Everett, Washington."[7] Ingram explained that this mode of delivery, like a cash payment, "helps to further distance [the sender] from being tied back to the package if it were to be intercepted via law enforcement."

---

[7]   Trooper Ingram's use of the term "drop-box" may be mistaken because it conflicts with other testimony indicating that the package was sent from a Kinko's/FedEx office.

The final indicator was Ingram's belief that the recipient, "Mikey Sheeby," was fictitious. Before the dog sniff, Ingram checked the Alaska Public Safety Information Network (APSIN) and found no one named Mike, Michael, or Mikey Sheeby.[8] According to Ingram, APSIN contains the names of people with an Alaska identification card or driver's license, and people who have had contact with the criminal justice system. Ingram also checked the "Mat-Com ... computer automated dispatch," a database compiled by the combined dispatch center for all police in the Matanuska-Susitna Valley. Ingram explained that Mat-Com indicates a "history [of police contact] at a house and who ha[s] been previously contacted at a [particular] residence." This database did have some history of individuals at the address given on the package, but none concerning a person named Sheeby.[9] Ingram decided that these factors, taken

---

[8] At trial, Trooper Ingram testified concerning the coverage of APSIN:

> If you have a driver's license, or if you've ever been contacted by the police, or if you had a criminal case, anything along those lines, you would be generated in an APSIN and there would be some sort of record of you existing in this state. Now, Alaska is pretty closed off. Most of the time when I find people they're in APSIN. I'm not saying that everyone is in APSIN because it's not all encompassing for the entire world, but mostly if you're in Alaska most of the time you're going to be ... in the system.

[9] Bochkovsky states in his brief that Ingram verified that the phone number listed for the sender was a real number in Everett, Washington, and confirmed that Mark Vu was a real person in Bellevue, Washington, about 30 miles away from Everett. But it is evident from Trooper Ingram's affidavit for a search warrant that he checked the phone number on the airbill and sought information concerning the sender after the dog had already sniffed the package. Since the focus of our inquiry is on what Ingram knew immediately before subjecting the package to the dog sniff, this information should not be considered as part of the reasonable suspicion inquiry. If considered, it would not be helpful to Bochkovsky. Trooper Ingram testified that the telephone number listed as that of the sender was a cell phone coming from Everett that had no identifier for the owner of the cell phone. He also testified that he found no "Mark Vu" in Everett, but found a Mark Tu Vu in Bellevue. He clarified at trial that "I learned that there was an individual by the name of Mark Tu Vu, T-u

(continued...)

together, justified subjecting the package to a canine sniff.

To facilitate the dog sniff, the package was placed on the floor of the FedEx facility, along with other packages. The package remained on the floor for a short time until the dog sniff was conducted. There is no suggestion that any delay in delivery would have occurred if the dog had not indicated that contraband was present.

*Why we conclude that the troopers had reasonable suspicion to briefly detain the package and subject it to a dog sniff*

Bochkovsky claims that Ingram lacked reasonable suspicion to subject the package to a canine sniff for narcotics. He argues that the indicators Ingram relied on to conclude that the package probably contained narcotics were innocuous and that the trooper conducted an inadequate investigation before concluding that "Mikey Sheeby" was a fictitious name.

Under our case law, police are required to have reasonable suspicion that a package contains illegal drugs before they may temporarily detain it or subject it to sniffing by a drug detection dog.[10] This means that there must be some evidence that

---

[9] (...continued)
was the middle — maybe it's a middle name, maybe it's the extended version of the last name, I don't know, but I did find a name of Mark Tu [V]u out of that Washington area. ..." He added that this person's address was not the address listed on the package as that of the sender, and he made the same point in his affidavit for a search warrant.

[10] *Gibson v. State*, 708 P.2d 708, 710-11 (Alaska App. 1985) (temporary detention of package justified by reasonable suspicion); *Pooley v. State,* 705 P.2d 1293, 1310-11 (Alaska App. 1985) (dog sniff of luggage justified by reasonable suspicion).

We note that the prevailing view in other jurisdictions is that no seizure occurs when a shipped package is handled and detained for the purpose of a dog sniff, so long as the package would be timely delivered if the dog sniff revealed no drugs and the carrier was not deprived of custody of the package. *See, e.g.*, *State v. Eichers*, 853 N.W.2d 114, 117, 123
(continued...)

"serve[s] to differentiate the suspected package from the body of innocent packages."[11] But it does not mean that every factor the police rely on must be suggestive of narcotics; reasonable suspicion may be based on a series of seemingly innocent acts which, when "taken together[,] warranted further investigation."[12] "Moreover, circumstances which appear innocent to the outside observer may suggest criminal activity to experienced law enforcement officers."[13]

In arguing that there was no reasonable suspicion for the dog sniff in this case, Bochkovsky relies primarily on *McGee v. State*, a case in which this Court found that the police lacked reasonable suspicion to subject a FedEx package to a spectrometer test.[14] A spectrometer test, like a dog sniff, can reveal the presence of illegal drugs in an unopened package.

---

[10] (...continued)
(Minn. 2014) (package taken off UPS conveyer, placed on floor, and subjected to dog sniff: no seizure under federal and state constitutions because no meaningful interference with individual's possessory interest in the property); *see also* 4 Wayne R. LaFave, *Search and Seizure*, § 9.8(e) at 1009, 1011-12 nn.166, 173 (5th ed. 2012) (collecting cases). Likewise, the prevailing view elsewhere is that a dog sniff of a detained package is not a constitutionally protected search. *See, e.g.*, *United States v. Place*, 462 U.S. 696, 707 (1983) (subjecting luggage to a sniff by a narcotics dog is not a search because "the manner in which information is obtained through this investigative technique is much less intrusive than a typical search"). "Most states that have addressed the use of drug detecting canines have followed *Place* and have held that the use of drug detecting canines does not constitute a search." 1 *LaFave*, *supra* § 2.2(g) at 693 n.384 (quoting *State v. Scheetz*, 950 P.2d 722 (Mont. 1997)).

[11] *McGee v. State*, 70 P.3d 429, 433 (Alaska App. 2003) (Mannheimer, J., concurring).

[12] *Cortez v. State*, 2002 WL 31307848, at *3 (Alaska App. Oct. 16, 2002) (unpublished) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)).

[13] *Id.*

[14] *McGee v. State*, 70 P.3d 429, 430 432 (Alaska App. 2003).

In *McGee*, the officer relied on some of the same factors to conclude that the package was suspicious: the airbill was addressed by hand, the package was sent via overnight delivery, the shipping charge was paid in cash (about $20), and the package came from Tacoma, Washington, which the officer identified as a frequent "source" city for drugs.[15] The package was also addressed to "Sam McGee." The officer testified that he thought this name was comical and fictitious because he recalled "a legend of Sam McGee or something."[16] But the officer did nothing to check this suspicion. We upheld the trial court's conclusion that the seizure was not based on reasonable suspicion. We concluded that the officer's belief that McGee's name was fictitious was merely subjective and that, without this fact, there was little to distinguish the package from any small express package sent from one individual to another.[17]

Bochkovsky argues that the factors that supported Trooper Ingram's decision to subject the package to a dog sniff — in particular, the handwritten label, the overnight delivery, and the payment in cash[18] — were likewise inadequate to give rise to reasonable suspicion. He also argues that Ingram's efforts to confirm whether the recipient "Mikey Sheeby" was fictitious were insufficient because "it was not reasonable for Ingram to conclude that Mikey Sheeby did not exist in Alaska simply because he could not be found in APSIN or Mat-Com."

---

[15] *Id*. at 431.

[16] *Id*.

[17] *Id*. at 432.

[18] There was testimony at trial that Washington state is a "source" state for drugs shipped to Alaska, but this fact was not brought out at the evidentiary hearing, and the superior court did not rely on this fact in upholding the search. Although we have previously relied on evidence presented at trial to support the ruling of a trial court on a suppression issue, we find it unnecessary to do so here. *See Waters v. State*, 64 P.3d 169, 171 (Alaska App. 2003); *Hubert v. State*, 638 P.2d 677, 680 n.2 (Alaska App. 1981).

Bochkovsky points out that in *Cooley v. State* — an unpublished case in which we upheld the search of a package addressed to a fictitious recipient — the trooper consulted not just APSIN, but another database that included recipients of the permanent fund dividend and holders of hunting and fishing licenses before concluding that the addressee was fictitious.[19]

In *Cooley*, there were also other indicators that the package might contain narcotics: it was sent from an individual to another individual, in a used box rather than a UPS shipping box, and the box was heavily taped, which was suspicious to the officer because it suggested an attempt to eliminate odors.[20] It had also been mailed from a shipping and receiving company, a delivery method that allowed the shipper to remain anonymous.[21] The officer noticed ramen noodles stuck to the tape under the package, which he found odd because that commodity was readily available in Juneau.[22] The package was also sent second-day air from California, a "hub" location for drugs coming from Mexico, at a cost of $63.99.[23] The officer testified that he had observed about 1200 parcels on the day in question, and that this was the only package he singled out for investigation.[24]

However, the "turning point" in the superior court's conclusion in *Cooley* that there was reasonable suspicion that the package contained illegal drugs was the

---

[19] *Cooley v. State*, 2009 WL 2568552 (Alaska App. Aug. 19, 2009) (unpublished).

[20] *Id.* at *1.

[21] *Id.*

[22] *Id.*

[23] *Id.* at *1-2.

[24] *Id.* at *2.

evidence that the recipient was a fictitious person.[25] The officer's search of two databases indicated that there was no record of the recipient in Juneau and that the name associated with the address on the package was not the recipient's name.[26]

In the present case, we conclude that the physical details of the mailing of the package — mainly the handwritten label, the next-day delivery, and the payment in cash — would not have sufficed, standing alone, to distinguish the package from an innocent package shipped for express delivery from one individual to another. But, as in *Cooley*, we conclude that the reasonable suspicion standard was satisfied when Ingram determined that, in addition to these factors, the recipient of the package was apparently fictitious because this is a characteristic not shared by most innocent packages.[27]

Bochkovsky argues that Trooper Ingram had an insufficient basis for his conclusion that the addressee was probably fictitious. But unlike the police officer in *McGee*, Trooper Ingram did not rest his conclusion on the fact that the name "Mikey Sheeby" was comical or strange. Instead, he conducted an inquiry to see if there was a Mike or Mikey Sheeby, or some variant of that name, in APSIN, the statewide database. The APSIN database is not small and not mainly composed of people with criminal records. The APSIN annual report for 2012 states that there are over two million "records" in the system, of which approximately 1.8 million records relate to persons with no criminal history.[28] Further, Ingram was not content to rely on APSIN; he also

---

[25] *Id.*

[26] *Id.* at *1.

[27] *Id.* at *3.

[28] *Dep't of Pub. Safety, State of Alaska, State Central Repository of Criminal Justice Information: Annual Report of Audits and Statistics - For Fiscal Year 2012*, (Feb. 15, 2012),
(continued...)

searched the "Mat-Com" database. This database contributed additional relevant information: there was no Sheeby in the system, but there was some history of individuals with other names at the address given on the package. Based on this information, it was objectively reasonable for Ingram to conclude that "Mikey Sheeby" was probably fictitious.

We recognize that a search using APSIN is not all-encompassing: children and visitors to the state are not likely to appear in the database.[29] But reasonable suspicion does not require an officer to rule out all possibility of innocent behavior.[30] The test serves as an objective standard for decisions that must be made quickly based on "slight proof."[31] Requiring a comprehensive investigation as a predicate for reasonable suspicion would subvert the purpose of that test, which is to permit investigatory detentions on less than probable cause to determine the need for further investigation.[32]

For the reasons described above, we conclude that the reasonable suspicion standard was satisfied in this case. Trooper Ingram articulated specific and objective

---

[28] (...continued)
*available at*, http://dps.alaska.gov/statewide/docs/cjis/FY12_Annual_Report.pdf.

[29] But the surnames of resident children usually will appear, since children usually bear the surname of at least one parent.

[30] *See State v. Moran*, 667 P.2d 734, 736 (Alaska App. 1983).

[31] *Gibson v. State*, 708 P.2d 708, 709-10 (Alaska App. 1985) ("[T]he proper question [is] whether the officer could reasonably surmise that the defendant was engaged in criminal activity; that is, whether he could form the notion on slight proof.").

[32] *See Coleman v. State*, 553 P.2d 40, 44-45 (Alaska 1976) ("[W]e deal here with an entire rubric of police conduct — necessarily swift action predicated upon the on-the-spot observations of the officer on the beat — which historically has not been, and as a practical matter could not be, subjected to the warrant procedure.") (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

reasons which, "taken together warranted further investigation,"[33] to ascertain whether the FedEx package contained illegal drugs.

*The sufficiency of the evidence question*

Bochkovsky was convicted of violating AS 11.71.020(a)(1), which applies when a person knowingly "possesses any amount of a schedule IA controlled substance with intent to ... deliver."[34] Oxycodone is a schedule IA controlled substance.[35] Bochkovsky argues that there was insufficient evidence to convict him of this crime with respect to the intent to deliver element.

"When a defendant challenges the sufficiency of the evidence to support the verdict, the test is whether, viewing the evidence (and the inferences to be drawn from that evidence) in the light most favorable to upholding the verdict, fair-minded people could conclude that the State had proved these elements."[36]

Bochkovsky presents a two-part argument challenging the sufficiency of the evidence used to prove an intent to deliver the drugs. He first claims that there was no evidence that he "actually or constructively possessed the 129 Oxy[C]ontin pills found in the original box." This argument is irrelevant. Under the statute, the State did not have to prove that Bochkovsky either actually or constructively possessed all 129 pills. The statute merely requires possession of "any amount" of a controlled substance.

---

[33]   *Cortez v State*, 2002 WL 31307848, at *3 (Alaska App. Oct. 16, 2002) (unpublished) (quoting *Terry*, 392 U.S. at 22).

[34]   *See Bell v. State*, 519 P.2d 804, 809 n.17 (Alaska 1974) (noting that the State must demonstrate knowing possession).

[35]   AS 11.71.140(b)(1)(N).

[36]   *Hoekzema v. State*, 193 P.3d 765, 767 (Alaska App. 2008) (citing *Eide v. State*, 168 P.3d 499, 500-01 (Alaska App. 2007)).

The second part of Bochkovsky's argument is more germane, and consists of two subparts. He argues (1) that there was insufficient evidence that he knew what the package contained; and (2) that even if he knew the package originally contained 129 pills, this knowledge was insufficient to show that he intended to deliver them.

As to the first question, we conclude that the evidence was sufficient to permit a reasonable inference that Bochkovsky knew the package contained drugs. His brother testified that Bochkovsky had moved to Alaska from Everett, Washington, only a few weeks before the incident in question and that he had been expecting a package. This testimony suggests that the shipment was not a surprise to him. The username for the computer found in Bochkovsky's room was "Mikey," and his brother confirmed that Bochkovsky goes by the name "Mikey." Bochkovsky accepted delivery of the package — addressed to a person whose first name was "Mikey" — and he opened the package within minutes of receiving it. Although Bochkovsky answered the door for the delivery person, he did not respond when the troopers knocked and announced their presence. Furthermore, the physical evidence showed that when Bochkovsky opened the package, he immediately went to the bag of candy in which the drugs had been originally packed, opening the bag and scattering the candy on the bedroom floor. The troopers also found a slip of paper with the package's FedEx tracking number written on it in the room where he was staying. While the troopers did not find much other evidence that Bochkovsky was a drug dealer, they did find two money transfer orders for $1000 each in Bochkovsky's wallet. From these circumstances, a reasonable jury could conclude that Bochkovsky knew what the shipped package originally contained, and that therefore he knowingly possessed the one remaining pill when the package was delivered to him.

The second question is whether, based on the inference that Bochkovsky knew that the original package contained 129 pills, a jury could also reasonably infer that he intended to sell them. As already noted, the troopers found little apart from the two

money transfer orders to indicate that Bochkovsky was involved in drug dealing. The troopers did not find other suspicious materials such as scales, ledgers, or residues. Defense counsel argued this lack of evidence in closing, while the prosecutor asserted that Bochkovsky was new to Alaska and was "setting up shop."

But the state did introduce evidence to the effect that 129 OxyContin pills of 80 milligrams each was more than an individual would possess for personal use. At trial, Ingram explained that when the troopers found the OxyContin pills, "[they] knew through [their] training and experience that the amount ... found ha[d] a high dollar value." He stated that the pills were "pretty desirable in the drug trade," since a pill of 80 milligrams was the largest size of OxyContin pills. Ingram added that normally street sales of OxyContin are for one or two pills. He further explained that "[a]n end user would just typically buy one pill. One, it helps get their fix; two, [the pills are] expensive, they're just trying to maintain their habit. ... So you don't need these elaborate scales [or] packaging materials ... ." He estimated that one pill would sell for $100 to $120 in the Mat-Su Valley and $220 to $250 in more remote areas. He thought that 129 pills had a street value of over $10,000. He stated that this quantity was a "mini gold mine" which he believed "was for the purposes of distribution."

It is well established that possession of a large quantity of drugs is evidence of intent to deliver.[37] We conclude that based on this evidence, a reasonable jury could conclude that Bochkovsky intended to sell the drugs.

---

[37] *See,* e.g., *Nelson v. State*, 2012 WL 399239, at *3 (Alaska App. Feb. 1, 2012) (unpublished); *United States v. Johnson*, 357 F.3d 980, 984 (9th Cir. 2004) ("A jury can infer intent to distribute from possession of a large quantity of drugs."); *United States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir. 1995) ("Intent to distribute can be inferred from the possession of a large quantity of drugs, too large for personal use alone."); *United States v. Howard*, 966 F.2d 1362, 1365 (10th Cir. 1992); *United States v. Samad*, 754 F.2d 1091, 1096, n.12 (4th Cir. 1984).

*The small quantities mitigator*

Bochkovsky additionally argues that the superior court erred in rejecting the "small quantities" mitigating factor of AS 12.55.155(d)(13). This subsection provides:

> (d) The following factors shall be considered by the sentencing court if proven in accordance with this section, and may allow imposition of a sentence below the presumptive range set out in AS 12.55.125:
>
> . . . .
>
> (13) the defendant is convicted of an offense specified in AS 11.71 and the offense involved small quantities of a controlled substance ... .

Possession of any amount of a IA controlled substance with intent to deliver is a Class A felony.[38] The maximum sentence for a Class A felony is 20 years and the presumptive term for a first felony offender such as Bochkovsky is 5 to 8 years.[39] The trial court sentenced Bochkovsky to a term within this range, 6 years.

The function of a mitigating factor is to permit a sentencing judge to impose a sentence that falls below the sentencing range. A defendant has the burden of proving mitigating facts by clear and convincing evidence.[40] Trial court findings of fact concerning mitigating factors are reviewed deferentially and may be reversed only if clearly erroneous; whether a mitigating factor applies to a particular set of facts is a question of law which is reviewed *de novo*.[41]

---

[38] AS 11.71.020(d).

[39] AS 12.55.125(c)(1).

[40] AS 12.55.155(f)(1); *Whiting v. State*, 191 P.3d 1016, 1021 (Alaska App. 2008).

[41] *State v. Parker*, 147 P.3d 690, 694 (Alaska 2006).

Bochkovsky argues that because he actually possessed only one pill his offense "involved" small quantities of a controlled substance. We see little to recommend this argument. In assessing mitigating factors, courts must take "a realistic assessment of the totality of the evidence."[42] Taking such an approach in this case, the sentencing judge rejected the small quantity mitigator, finding that Bochkovsky was "supposed to have received 129 [pills]" and that "one pill doesn't make a lot of sense in [the context of Bochkovsky's conviction of intent to distribute]." We agree with this conclusion and find no error.

Appraised realistically, Bochkovsky's offense involved 129 pills, and it was this quantity, in light of its value, that gave rise to the inference that he had an intent to sell OxyContin. It was his burden to prove the small quantity mitigator. Thus, for sentencing purposes, he was required to prove that he intended to sell only a small quantity of OxyContin — that is, that he did not intend to sell all 129 pills, but only a small number of pills. He presented no evidence on this issue and thus did not carry his burden.

Where police remove most of the drugs from a package prior to a controlled delivery, an accused cannot receive a windfall based on the small quantity of drugs actually delivered. As stated in *United States v. Fullilove*:

> Several of our sister circuits have addressed this same question. All have concluded that a defendant may be held accountable under relevant conduct principles for contraband removed from a package prior to a controlled delivery ... .
>
> In each of these cases, the court noted the fortuity of intervention by law enforcement officials, stating that the fact of the intervention did not alleviate the seriousness of the defendant's conduct.

---

[42] *Juneby v. State*, 665 P.2d 30, 39 (Alaska App. 1983).

. . . .

Our decision is supported also by sound policy considerations. ... A holding that Fullilove, who clearly intended to obtain whatever quantity of cocaine base was in the package, should not be held accountable for the full amount, could have the perverse effect of encouraging law enforcement officers to take unacceptable risks for the sake of obtaining a sentence that accurately reflects the gravity of the defendant's conduct.[43]

We agree with this rationale.

*Conclusion*

For the reasons stated, the judgment of the superior court is AFFIRMED.

---

[43] *United State v. Fullilove*, 388 F.3d 104, 107-08 (4th Cir. 2004) (citations omitted).

Judge MANNHEIMER, dissenting.

I disagree with this Court's resolution of this appeal because I conclude that the information known to the police was not adequate to constitute the "reasonable suspicion" that our law requires before the police can remove a package from the stream of commerce and subject it to specialized investigative techniques (like having a trained dog sniff the package).

As explained in the majority opinion, the trial court relied on a combination of several factors when reaching the conclusion that the troopers had sufficient "reasonable suspicion" to justify removing the package from the stream of commerce and having a trained dog sniff the package for drugs. But as the majority opinion concedes, this information — even considered in the aggregate — was marginal.

The package had a handwritten label. The trooper testified that this fact suggested that the package was probably not a commercial shipment. The person who shipped the package paid FedEx in cash — again, an apparent indication that this was not a commercial shipment.

But these factors merely suggest that the person who shipped the package was not a typical business shipper — that the shipper was an individual who either was running a small business or was using FedEx to ship a package for personal reasons.

The State also relies on the fact that the shipper paid approximately $68.00 to have the package sent "next day air". According to the trooper, this fact was a "pretty significant" indication that the package contained drugs. But the trooper's explanation of this purported significance was illogical, to the point of being nonsensical. Here is what the trooper said:

> We know that individuals [who ship] drugs through commercial modes ... often pay cash because the items inside

[the package] are more valuable than the money they're [spending] to have a speedy delivery of that package.

Even if we assume that the trooper misspoke — that he meant to say "often ship 'next day air' " instead of "often pay cash", this purported explanation still fails to support an inference of criminality — because it applies to *anyone* who is sending or ordering something of value through the mail or through commercial shippers like FedEx.

No matter *what* is being shipped (*e.g.*, drugs (lawful or unlawful), jewelry, custom auto parts, DVDs, or cosmetics), one can reasonably expect that the more valuable the contents of the package, the less likely it is that the sender or purchaser will balk at paying a higher fee for speedy delivery — since the increase in the shipping fee will be only a tiny percentage of the entire cost of the transaction.

The trooper also testified that the package in this case was suspicious because it was shipped from a "Kink[o's] / FedEx copy" — which the trooper incorrectly identified as "basically a drop-box". The trooper asserted that people who ship drugs will use drop-boxes, rather than transacting the shipment face-to-face with a store employee, because this "helps to further distance [the shipper] from being tied back to the package".

But as the majority opinion explains in footnote 7, the trooper's assertion about a "drop-box" was wrong. "Kinko's / FedEx copy" was the name of a chain of stores. The package in this case was shipped from an office, not a drop-box.

The majority opinion concedes that the foregoing factors, even taken in combination, "would not have sufficed ... to [sufficiently] distinguish the package [in this case] from an innocent package shipped for express delivery from one individual to another."

But my colleagues in the majority believe that these factors became sufficient because of the addition of one final factor: the trooper's conclusion that the person to whom the package was addressed, "Mikey Sheeby", was a fictitious person.

According to the trooper, he concluded that this name was likely fictitious because, when he ran the name "Mikey Sheeby" in the Alaska Public Safety Information Network (APSIN), and in a separate database that records the details of all police dispatches within the Matanuska-Susitna Borough, he found no entry for "Mikey Sheeby", "Michael Sheeby", or "Mike Sheeby". The trooper *did* verify that the address listed for Mikey Sheeby was a legitimate address (although the trooper found no record of anyone by the name of Mikey Sheeby connected to that address).

My colleagues conclude that the trooper's search of these two databases was a reasonable effort, and that the lack of record for the name "Mikey Sheeby" was a substantial indication that no such person existed.

But the name "Mikey Sheeby" suggested that the recipient might be a child. The trooper had access to the database of persons who had applied for the Alaska Permanent Fund Dividend[1] — a list that was much more likely than APSIN to contain the names of children. But the trooper did not use this database.

The majority opinion nevertheless contends that the absence of the name "Mikey Sheeby" in APSIN is significant because the APSIN database is quite broad. Citing the APSIN annual report for Fiscal Year 2012 (the latest year posted on the Internet), the majority asserts that this database contains over two million person records.[2]

---

[1] *See Cooley v. State*, unpublished, 2009 WL 2568552, at *1 (Alaska App. 2009).

[2] *Dep't of Pub. Safety, State of Alaska, State Central Repository of Criminal Justice Information: Annual Report of Audits and Statistics - For Fiscal Year 2012*, (Feb. 15, 2012), *available at*, http://dps.alaska.gov/statewide/docs/cjis/FY12_Annual_Report.pdf.

On its face, this figure appears astounding: it amounts to approximately three times the number of people currently living in this state. But this number becomes less astounding when you understand that these two million "person records" are the accumulation of years of data reporting.

For example, APSIN contains the criminal history records of 325,825 different persons,[3] and these persons have generated records of 1,580,051 separate criminal charges.[4] And the largest portion of APSIN records — slightly under 1,340,000 — are based on the issuance of driver's licenses.[5]

Obviously, a search of driver's license records and criminal history records is not the type of search that is likely to uncover the names of children. The majority opinion concedes as much: it expressly acknowledges that "children and visitors to [this] state are not likely to appear in the [APSIN] database."

But instead of criticizing the trooper for confining himself to these databases when there was reason to believe that the addressee of a package was a child, the majority concludes that the trooper's search of APSIN was good enough.

According to the majority, the trooper in this case was faced with the kind of decision that "[had to] be made quickly", and therefore the law demands only "slight proof". I disagree. I do not know for certain how much longer it would have taken the trooper to search the list of Permanent Fund Dividend applicants, but there is nothing in the record to suggest that a search of this additional database would have lengthened the trooper's investigation significantly.

Accordingly, I dissent from the Court's decision to uphold this search.

---

[3] *Id*. at 13.

[4] *Id*. at 31.

[5] *Id*. at 16.