NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

CHRISTOPHER R. STACY,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12668
Trial Court No. 1KE-13-00753 CR

O P I N I O N

No. 2714 — November 5, 2021

Appeal from the Superior Court, First Judicial District, Ketchikan, William B. Carey, Judge.

Appearances: Emily L. Jura, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Eric A. Ringsmuth, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, Harbison, Judge, and Clark, District Court Judge.[*]

Judge ALLARD.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Christopher R. Stacy was convicted, following a jury trial, of second-degree misconduct involving a controlled substance (possession of heroin with the intent to deliver).[1] Stacy raises four claims on appeal.

First, he argues that the trial court erred when it failed to instruct the jury on accomplice liability as it related to the lesser included offense of fourth-degree misconduct involving a controlled substance (possession of heroin). For the reasons explained here, we conclude that any error was harmless because Stacy's constructive possession of the heroin was not in dispute at trial.

Second, he argues that the trial court erred in allowing the investigating officer to testify to his personal opinion that Stacy intended to sell some of the heroin. We agree with Stacy that this opinion testimony was improper, but we conclude that it was harmless in the larger context of the case and the other proper hybrid testimony offered by the officer.

Third, Stacy argues that there was insufficient evidence presented at trial that he intended to deliver any of the two ounces of heroin that he possessed. Viewing the evidence in the light most favorable to upholding the verdict, as we are required to do on appeal, we conclude that there was sufficient evidence to support Stacy's conviction for possession of heroin with the intent to deliver.

Lastly, Stacy raises an important question of constitutional law. He argues that his due process rights under *Brady v. Maryland* and the Alaska Constitution were violated when the trial court denied his motion to compel the prosecutor to disclose any *Brady* impeachment material that was in the personnel files of the law enforcement

---

[1] Former AS 11.71.020(a)(1) (pre-July 2016 version).

officers who testified at his trial.[2] The prosecutor took the position that the State had no duty to learn of any *Brady* material in the personnel files of the law enforcement officers because he personally had no access to their otherwise confidential personnel files.

For the reasons explained in this opinion, we conclude that the confidentiality of these files does not, standing alone, absolve a prosecutor of their duty under *Brady v. Maryland*[3] and *Kyles v. Whitley*[4] to take reasonable steps to learn of favorable material evidence in the possession of the prosecution team, including personnel files. Because the prosecutor in this case made no effort to comply with the mandate of *Brady*, we remand this case to the trial court for further proceedings to determine if a *Brady* violation occurred.

*Background facts and prior proceedings*

On January 6, 2013, Alaska State Troopers made contact with Christopher R. Stacy and Jonathan Oaksmith as they disembarked from the ferry in Ketchikan, Alaska. The two men were returning from Washington, and the troopers had received a tip that they were carrying drugs. The troopers separated the two men, and both men consented to the troopers searching their belongings.

---

[2]    *Brady v. Maryland*, 373 U.S. 83 (1963).

[3]    *Id.* at 87 (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"); *see also United States v. Bagley*, 473 U.S. 667, 682 (1985) (holding that evidence is "material" only if there is a "reasonable probability" that it would alter the trial result); *Giglio v. United States*, 405 U.S. 150 (1972) (extending *Brady* to impeachment material).

[4]    *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (holding that prosecutor has a "duty to learn" of *Brady* material known to members of the prosecution team, including law enforcement).

In Oaksmith's belongings, the troopers discovered two ounces (56.7 grams) of black tar heroin hidden inside a jar of peanut butter. There were two large pieces of heroin and one smaller portion of approximately six grams.

Oaksmith initially denied that any of the heroin belonged to him. However, he would later testify that Stacy had purchased the heroin and offered him six grams to transport the heroin for Stacy.

In exchange for his testimony against Stacy at trial, Oaksmith was allowed to plead to fourth-degree misconduct involving a controlled substance (possession of heroin). The State indicted Stacy on one count of second-degree misconduct involving a controlled substance (possession of heroin with intent to deliver).

At trial, Oaksmith testified that, in October 2012, he had accompanied Stacy and another man to Seattle, where Stacy had purchased about half an ounce of heroin. Oaksmith further testified that, in December 2012, Stacy talked with him about going back to Seattle to obtain more heroin. Oaksmith agreed to accompany Stacy and act as his "mule" in exchange for six or seven grams of heroin. Stacy financed the trip completely, selling a four-wheeler and liquidating several thousand dollars from his military disability funds to pay for the trip and the heroin.

Text messages between Oaksmith and his girlfriend corroborated Oaksmith's testimony. In the messages, Oaksmith told his girlfriend that he was "running heroin from Seattle to Ketchikan" for Stacy. He also informed her of his plans to sell some of the heroin he would receive for being the "mule."

Prior to returning to Ketchikan with the heroin, Stacy contacted a friend and asked her to watch for undercover law enforcement at the Ketchikan ferry terminal when he and Oaksmith arrived. However, the friend failed to show.

Investigator Dur'an, one of the troopers involved in the investigation, testified that the price of heroin in Ketchikan is exponentially higher than the price of

heroin in Seattle, and that significant money can be made by purchasing heroin in Seattle and then selling it in Ketchikan. In Dur'an's experience, most heroin addicts are struggling to get by and cannot afford the cost of traveling to Seattle to purchase heroin at cheaper rates. The price disparities between Seattle and Ketchikan also create a "huge financial incentive" to purchase large quantities in Seattle and then resell portions at a higher rate in Ketchikan.

At the close of trial, the jury found Stacy guilty of second-degree misconduct involving a controlled substance (possession of heroin with the intent to deliver).

This appeal followed.

*Stacy's argument that the trial court committed reversible error when it failed to instruct the jury on accomplice liability in relation to the lesser included offense of fourth-degree misconduct involving a controlled substance*

Stacy's defense at trial was that he was a serious heroin addict and that he had purchased this large amount of heroin solely for his personal use and not for delivery to anyone else. In accordance with this defense, Stacy's attorney requested that the jury be instructed on the lesser included offense of fourth-degree misconduct involving a controlled substance (possession of heroin).

The trial court granted this request, and the court instructed the jury on the elements of both second-degree misconduct involving a controlled substance and the lesser included offense of fourth-degree misconduct involving a controlled substance. Because Stacy was charged with acting either as a principal or as an accomplice with regard to the second-degree misconduct involving a controlled substance (possession with intent to deliver), the jury was instructed on accomplice liability as to that charge. However, the jury was not instructed on accomplice liability with regard to the lesser

– 5 – 2714

included offense of fourth-degree misconduct involving a controlled substance (simple possession). Neither party noticed this omission or objected to the lesser included offense instruction as incomplete.

On appeal, however, Stacy now argues that the omission of an accomplice liability instruction for the lesser included charge requires reversal of his conviction. Stacy argues that without an accomplice liability instruction on the lesser included offense, the jury might not have understood that it could convict him of the lesser included offense under an accomplice theory. Thus, according to Stacy, the jury may have improperly voted to convict him of the higher offense because it felt it did not have the option of convicting him of the lesser included.

We find no merit to this argument given the manner in which this case was litigated. At trial, the State presented evidence that Stacy had purchased the heroin and that Stacy had hired Oaksmith as a "mule" to transport the heroin in exchange for a small portion. For the most part, Stacy did not contest this evidence. That is, he did not contest that he "possessed" the vast majority of the heroin found in Oaksmith's bag; instead his defense was that the heroin was for his own personal use. Moreover, the jury would have understood that Stacy "possessed" the heroin even though it was in Oaksmith's bag because the jury was directly instructed on the concept of constructive possession — *i.e.*, that a person can "possess" an item in the legal sense of the word even if it is not in their immediate physical control.[5]

In other words, contrary to the argument Stacy makes on appeal, the jury could have found Stacy "possessed" — *i.e.*, exercised dominion or control over — the

---

[5] AS 11.81.900(a)(50) ("'possess' means having physical possession or the exercise of dominion or control over property"); *see also Dirks v. State*, 386 P.3d 1269, 1270 (Alaska App. 2017) ("'Constructive possession' refers to a person's authority to exercise dominion or control over property even though it is not in their immediate physical possession.").

heroin found in Oaksmith's bag as a principal without resorting to an accomplice theory. Because the facts as presented by both parties supported a guilty verdict on the lesser included offense, there is no reason to believe that the conviction on the greater offense was a "compromise verdict" based on a perceived inability to convict Stacy as an accomplice on the lesser included offense.

In any event, because Stacy did not object at trial to the omission of an accomplice liability instruction with regard to the lesser included offense, he must now show plain error on appeal.[6] "In the context of jury instructions, plain error will be found only when the erroneous instruction (or the lack of an instruction) 'creates a high likelihood that the jury followed an erroneous theory[,] resulting in a miscarriage of justice.'"[7]

Here, given how this case was litigated and argued, we conclude that the absence of an accomplice liability instruction with regard to the lesser included offense did not confuse or mislead the jury. Accordingly, we find no plain error.

*Stacy's argument that Investigator Dur'an's opinion testimony was improper*

Before trial, the prosecutor notified Stacy and the trial court that he intended to offer Investigator Dur'an as a hybrid witness who would testify both to his investigative acts in the case as well as to his expert opinion that the amount of heroin

---

[6] *Heaps v. State*, 30 P.3d 109, 114 (Alaska App. 2001) ("If a litigant fails to make a specific and timely objection to a jury instruction or the failure to give a jury instruction, an appellate court's consideration of the asserted error is limited to plain error review.").

[7] *Id.* at 114 (quoting *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 91 (Alaska 1974)).

possessed by Stacy indicated an intent to distribute or deliver the substance. Stacy's attorney made no objection to this proposed testimony.

At trial, Investigator Dur'an testified that he had been an Alaska State Trooper for eight years, four of which were as a drug investigator. He also testified that he had special training for drug-related offenses and that he was familiar with the illicit drug trade in Ketchikan and southeast Alaska generally.

Dur'an corroborated Oaksmith's testimony concerning the various pricing of heroin in Ketchikan and Seattle. Dur'an stated that heroin in Ketchikan was normally purchased on the street in quantities of one gram or one-tenth of a gram, and that the price was generally around $500 per gram. He also confirmed that heroin could be bought much more cheaply in Seattle.

Dur'an then testified to his involvement in the investigation, which included logging the evidence, reviewing the records of Stacy's payments for the trip, speaking with Oaksmith, reviewing the limited text messages on Stacy's phone, and reviewing the extensive text messages on Oaksmith's phone. The prosecutor then asked Investigator Dur'an if he had reached "some conclusions about whether or not this heroin was being imported for delivery." Stacy's attorney objected to this testimony as "speculation" without any further explanation. The objection was overruled.

Investigator Dur'an then testified that his investigation led him to the conclusion that Stacy had financed the trip and purchased the two ounces of heroin, that Oaksmith was the person who smuggled the heroin, and that the arrangement upon their return to Ketchikan was that Oaksmith would receive around six grams as payment. Dur'an also stated that, based on these facts, he had concluded that the intent behind the Seattle purchase was both "personal use and commercial distribution of the heroin."

Dur'an went on to explain that, in his experience, heroin users typically did not have the financial means to acquire such a large amount of heroin. Instead, "given

– 8 – 2714

the traveling cost, the lodging cost, the cost of just entertaining themselves while they're there, it's more consistent with an individual that's going to take [that] substance and make a profit on it." Investigator Dur'an also testified that the amount of heroin in question suggested that Stacy and Oaksmith had an intent to distribute. Though he clarified: "I want to be clear, it's not that it's impossible for a person to have both the financial means to buy a bulk quantity of heroin for personal use, it's just not consistent [with] what I see." Instead, "[w]hat I see consistently is the people who bring in an ounce or two ounces are the people that are possessing it with the intent to resell that heroin here in town because . . . there's a huge financial incentive to bring it in in those quantities and resell it[.]" Investigator Dur'an testified that an individual selling two ounces of heroin in Ketchikan could potentially make "tens of thousands of dollars." But he testified that "I don't believe, based on . . . the totality of talking with everyone involved, [that] the intent was for them to distribute all of the heroin that was being possessed. I think there's no dispute that they intended to both use, at least use some." There were no objections to any of this testimony.

On appeal, however, Stacy argues that the trial court erred in allowing Investigator Dur'an to testify to his opinion that Stacy intended to distribute at least some of the heroin he purchased. Stacy asserts that this testimony was "more prejudicial than probative," as it "amounted to an opinion that Stacy was guilty" and because it "profil[ed]" Stacy as a "drug dealer." Thus, according to Stacy, this opinion testimony should not have been admitted under Alaska Evidence Rule 403.[8]

_____

[8] Alaska R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

Stacy's arguments on appeal arise from the peculiar nature of "hybrid" witnesses in criminal trials. The Alaska Supreme Court first discussed the concept of hybrid witnesses in *Miller v. Phillips*, a medical malpractice case.[9] There, the supreme court noted that the line between a "fact" witness and an "expert" witness "inevitably becomes blurred" when treating physicians testify in medical malpractice cases.[10] The court subsequently expanded the use of hybrid witnesses to include investigating law enforcement officers in *Getchell v. Lodge*, a personal injury civil negligence case.[11] There, the court ruled that it was not an abuse of discretion to allow a state trooper to testify both to his observations as the investigating officer and to his conclusions (based on his knowledge and experience) regarding the cause of the accident and the fault of the parties.[12] The court recognized, however, that there "is a danger that a police investigator's conclusion will be given undue weight by a jury."[13]

The danger that a police investigator's expert conclusion may be given undue weight by a jury is particularly acute in a criminal case. As we have previously recognized, the danger is that jurors "may surmise that the police are privy to more facts than have been presented in court, or they may be improperly swayed by the opinion of a witness who is presented as an experienced criminal investigator."[14]

---

[9]   *Miller v. Phillips*, 959 P.2d 1247 (Alaska 1998).

[10]   *Id.* at 1250; *see also Andrews v. State*, 286 P.3d 780, 783 (Alaska App. 2012) (holding that hybrid lay and expert testimony of nurse who performed sexual assault examination of victim was admissible in prosecution for second-degree sexual assault).

[11]   *Getchell v. Lodge*, 65 P.3d 50, 56-57 (Alaska 2003).

[12]   *Id.*

[13]   *Id.* at 57.

[14]   *Sakeagak v. State*, 952 P.2d 278, 282 (Alaska App. 1998) (citing *Flynn v. State*, 847

(continued...)

As a general matter, Alaska Evidence Rule 704 permits expert witnesses to testify to the "ultimate issue" to be resolved by the trier of fact.[15] But the commentary to the rule expressly warns that "an opinion of any person that a criminal defendant is guilty or innocent would not be admissible [under this rule]."[16] We have applied this rule in numerous cases and have previously admonished courts against allowing witnesses to give their personal opinion of a defendant's guilt or innocence.[17]

On appeal, the State asserts that Investigator Dur'an's statements never strayed outside the boundaries of permissible expert testimony. According to the State, Investigator Dur'an "educated the jury based on his training and experience, on the facts and circumstances often attendant in drug trafficking cases, and highlighted the evidence that was consistent with Stacy being engaged in drug trafficking[.]" The State maintains

---

[14] (...continued)
P.2d 1073, 1075-76 (Alaska App. 1993)).

[15] Alaska R. Evid. 704.

[16] Alaska R. Evid. 704 cmt. para. 6; *see also* Fed. R. Evid. 704(b) (barring an expert from testifying that the defendant had "a mental state or condition that constitutes an element of the crime charged"); Fed. R. Evid. 704 cmt. para. 4 (noting that, notwithstanding the fact that experts may now testify to the "ultimate issue," Evidence Rules 403, 701, and 702 should still be used to exclude expert opinions "which would merely tell the jury what result to reach"); *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990) (prohibiting expert from giving a direct opinion on defendant's guilt or innocence).

[17] *See, e.g.*, *Sakeagak v. State*, 952 P.2d 278, 282 (Alaska App. 1998); *Flynn v. State*, 847 P.2d 1073, 1075-76 (Alaska App. 1993) (reversing conviction where police officer acted akin to a human polygraph with regard to the truthfulness of the defendant's confession); *Thompson v. State*, 769 P.2d 997, 1003-04 (Alaska App. 1989) (reversing conviction based, in part, on witness vouching for victim's credibility); *cf. Kodiak v. Samaniego*, 83 P.3d 1077, 1088-89 (Alaska 2004) (noting that an expert should not be allowed to state their own conclusions on points that jurors are equally capable of determining for themselves) (citing *Spenard Action Comm. v. Lot 3*, 902 P.2d 766, 780-81 (Alaska 1995)).

that Investigator Dur'an simply "pointed out that while the amounts of money and heroin at issue were indicative of an intent to distribute, it was also possible Stacy was possessing the heroin for personal use."

We agree that if Investigator Dur'an had limited his testimony in this manner, it would have been unobjectionable.[18]  But the record shows that Dur'an's testimony sometimes went beyond these boundaries and ultimately resulted in Dur'an testifying to his personal opinion about Stacy's guilt on the critical issue before the jury — *i.e.*, his opinion that Stacy intended to distribute at least some of the heroin he had purchased.  This was objectionable opinion testimony that should generally not be permitted in a criminal trial.  However, there was no objection to Dur'an's testimony — or at least no objection on the grounds now raised on appeal.  The sole objection to Dur'an's opinion testimony was the defense attorney's objection of "speculation."[19]  We agree with the State that this was insufficient to preserve the arguments that Stacy now

---

[18]  *See* Alaska R. Evid. 702(a) (permitting witness to give opinion testimony if the witness is qualified "by knowledge, skill, experience, training or education" and if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue").

[19]  The defense attorney did not provide further information about what he considered was "speculation."  On appeal, Stacy argues that Dur'an's testimony was impermissibly speculative because it was based, in part, on what Stacy asserts was an erroneous assumption that the costs associated with traveling to Seattle to buy heroin in bulk for personal use would "probably" amount to the same total expense as simply buying the same amount of heroin in Ketchikan.  Stacy also includes a footnote allegedly demonstrating that Dur'an's calculations were wrong.  But Stacy was given an opportunity to challenge Dur'an's calculations on cross-examination, and his failure to do so does not render Dur'an's testimony speculative or inadmissible.

raises on appeal. Accordingly, to prevail on appeal, Stacy must establish plain error —
*i.e.*, obvious error undermining the fundamental fairness of the trial.[20]

While we disapprove of some aspects of Dur'an's testimony, we do not find plain error. The majority of Dur'an's testimony was, as the State claims, unobjectionable and permissible hybrid testimony. Moreover, as the State points out, Dur'an expressed a number of caveats in his testimony. Thus, the evidentiary basis for Dur'an's opinion and the possible lack of evidence to support that opinion were both before the jury.[21] The record also shows that the jury was properly instructed that they were the ultimate deciders of fact in this case. Given these circumstances and our review of the record as a whole, we conclude that Stacy received a fundamentally fair trial, and reversal of his conviction is not required under the plain error doctrine.

*Stacy's argument that there is insufficient evidence to support his conviction*

To convict Stacy of second-degree misconduct involving a controlled substance, the State was required to prove beyond a reasonable doubt that Stacy

---

[20] *Adams v. State*, 261 P.3d 758, 764 (Alaska 2011) (recognizing that plain error "involv[es] such egregious conduct as to 'undermine the fundamental fairness of the trial and contribute to a miscarriage of justice'" and requires a reviewing court to find that the error "(1) was not the result of intelligent waiver or a tactical decision not to object; (2) was obvious; (3) affected substantial rights; and (4) was prejudicial" (quoting *Raphael v. State*, 994 P.2d 1004, 1015 (Alaska 2000))).

[21] *Cf. Sakeagak*, 952 P.2d at 282-83 (finding police officer's testimony that he adopted an adversarial tone with the defendant because he believed the defendant killed his wife was not overly prejudicial because the officer's statement "added nothing of substance to an inference the jury could easily draw for themselves" and "the basis for [the officer's] conclusion and the possible lack of evidence to support that conclusion [were] before the jury").

possessed "any amount of a schedule IA controlled substance with intent to . . . deliver."[22]

At trial, there was no dispute that heroin is a schedule IA controlled substance.[23] And there was no dispute that Stacy "possessed" heroin in the sense that he exercised dominion or control over the majority of the heroin found in the peanut butter jar. Instead, the dispute at trial centered on whether Stacy possessed the heroin with the intent to deliver.

Under AS 11.71.900(7), "deliver" means "the actual, constructive, or attempted transfer from one person to another of a controlled substance whether or not there is an agency relationship." Notably, the State did not need to prove that Stacy intended to deliver *all* of the heroin that he possessed, or even a significant amount of the heroin; instead the State was only required to prove that Stacy intended to deliver "any" amount of heroin, even if the vast majority of it was intended for personal use.[24]

After the close of evidence at trial, Stacy's attorney moved for a judgment of acquittal, arguing that there was insufficient evidence to convict Stacy of possession of heroin with the intent to deliver. The trial court denied the motion, concluding that there was sufficient circumstantial evidence of an intent to deliver based on the large amount of drugs and "the intricacy of the plan and the effort that went into going down to get the stuff and bring it back."

On appeal, Stacy renews his argument that the evidence at trial was legally insufficient to convict him of possession with intent to deliver.

---

[22] Former AS 11.71.020(a)(1) (pre-July 2016 version).

[23] *See* AS 11.71.140(d)(11) (listing heroin as a Schedule IA controlled substance).

[24] Former AS 11.71.020(a)(1) (pre-July 2016 version).

Whether the evidence presented at trial is legally sufficient to support the defendant's conviction is a question of law that we review *de novo*.[25] When we review a claim of insufficiency, we are required to view all evidence — and all reasonable inferences from that evidence — in the light most favorable to upholding the jury's verdict.[26] Viewing the evidence in this light, we will uphold the verdict if a fair-minded juror could reasonably find that the State had proven the elements of the offense beyond a reasonable doubt.[27]

Here, we agree with Stacy that the evidence of intent to deliver was not overwhelming. Unlike Oaksmith, Stacy did not admit to any intent to deliver. Nor did the troopers find any "tools" indicative of drug distribution — such as ledgers, baggies, or scales. Instead, the primary evidence tending to indicate an intent to deliver was the large quantity of drugs that was purchased.

Under both Alaska and federal law, a jury can infer an intent to deliver from possession of a large quantity of drugs, provided that the amount at issue is larger than for personal use.[28]

---

[25] *Phornsavanh v. State*, 481 P.3d 1145, 1156 (Alaska App. 2021) (citing *Des Jardins v. State*, 551 P.2d 181, 184 (Alaska 1976)).

[26] *Id.* at 1156 (citing *Johnson v. State*, 188 P.3d 700, 702 (Alaska App. 2008) and *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Bochkovsky v. State*, 356 P.3d 302, 308-09 (Alaska App. 2015) (citing *Hoekzema v. State*, 193 P.3d 765, 767 (Alaska App. 2008)).

[27] *Jackson*, 443 U.S. at 319; *Phornsavanh*, 481 P.3d at 1156; *Johnson*, 188 P.3d at 702.

[28] *See Bochkovsky*, 356 P.3d at 310 ("It is well established that possession of a large quantity of drugs is evidence of intent to deliver."); *see also United States v. Johnson*, 357 F.3d 980, 984 (9th Cir. 2004) ("A jury can infer intent to distribute from possession of a large quantity of drugs."); *United States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir. 1995) ("Intent to distribute can be inferred from the possession of a large quantity of drugs, too large for personal use alone."); *United States v. Howard*, 966 F.2d 1362, 1365 (10th Cir. 1992);

(continued...)

On appeal, Stacy argues that this inference should not apply to his case because there was evidence that he was a heavy user of heroin. But the evidence at trial was that a heavy user of heroin consumes approximately half of a gram of heroin a day. The amount at issue here — 56.7 grams — was more than 100 times that amount. It was also twice as much heroin as has been recognized as indicative of an intent to deliver in other cases.[29] It is certainly possible that Stacy was buying in bulk for the next four to five months — as his lawyer claimed at trial — but a fair-minded juror could reasonably reject such an explanation.

In any case, Stacy's conviction does not rest on the amount of heroin alone. As the trial court noted when it denied Stacy's motion for a judgment of acquittal, a juror could also reasonably infer, based on "the intricacy of the plan and the effort that went into going down to get the stuff and bring it back," that this large amount of heroin was being purchased for more than just personal use. The evidence at trial showed that Stacy had traveled relatively recently to Seattle to purchase a lesser amount of heroin and that he was now returning to buy an even greater amount. The evidence also showed that Stacy had liquidated most of his assets for this trip and that he had taken steps to enlist Oaksmith as a "mule" (in exchange for a payment of six grams of heroin) and made efforts to have another person checking for undercover officers in Ketchikan. Added to

---

[28] (...continued)
*United States v. Samad*, 754 F.2d 1091, 1096 n.12 (4th Cir. 1984).

[29] *See Nelson v. State*, 2012 WL 399239, at *3 (Alaska App. Feb. 1, 2012) (unpublished) (holding that the jury could reasonably conclude defendant intended to distribute heroin based on police officer's testimony that heroin users generally use no more than 0.2 grams at a time, and possession of even half of the twenty-five grams found in defendant's case would be enough to suggest that the owner was involved in distribution); *see also Samad*, 754 F.2d at 1094-96 (twenty-two grams sufficient to support inference of intent to distribute); *United States v. Blake*, 484 F.2d 50, 57-58 (8th Cir. 1973) (fifteen grams of heroin sufficient to support inference of intent to distribute).

this evidence was the testimony by both Oaksmith and Investigator Dur'an of the extreme price differential between Seattle and Ketchikan and the tremendous financial incentive that existed to sell even a small amount of heroin in Ketchikan.

Thus, given the totality of the evidence presented at trial and viewing that evidence in the light most favorable to the verdict as we are required to do, we conclude that the evidence was legally sufficient to convict Stacy of possession with intent to deliver.

*Stacy's argument that the State has a duty to learn of Brady material that may be contained in the personnel files of law enforcement officers who are part of the prosecution team*

Before trial, Stacy's attorney requested, among other things, confirmation from the prosecutor that he had complied with his duties under *Brady v. Maryland*.[30] In particular, Stacy requested that the prosecutor examine the personnel files of the police officers and other state agents who would be testifying and disclose any material impeachment evidence contained in those files. The prosecutor opposed this request, asserting that he had no ability to examine these records because they were confidential under Alaska law. The defense attorney then moderated his request, asking that the prosecutor be required to contact the law enforcement agency that possessed the personnel records and to inquire as to whether they contained *Brady* material. The defense attorney also requested that, at the very least, the prosecutor be required to ask the witnesses themselves if any such material existed.

The prosecutor again opposed this request. According to the prosecutor, the only way for the defense to obtain any information about *Brady* material that might be contained in these files was by filing a motion for *in camera* review under *Booth v.*

---

[30] *Brady v. Maryland*, 373 U.S. 83 (1963).

*State*.[31]  In other words, the State took the position that the prosecution has no independent duty to learn of *Brady* material that might be contained in a police officer's personnel file.  The trial court agreed and denied the defense attorney's request.

On appeal, Stacy argues that the trial court's ruling violated his federal and state due process rights, and that his case should be remanded for an *in camera* review of the relevant personnel files to determine if they contain *Brady* material that should have been disclosed.  In support of this argument, Stacy cites to Ninth Circuit case law, which has held that a prosecutor has a duty to learn of *Brady* material contained in law enforcement personnel files.[32]

In response, the State argues that this Court has previously rejected the Ninth Circuit case law that Stacy relies on.[33]  The State also argues that the prosecutor has no duty to learn of *Brady* or *Giglio* material contained in a law enforcement officer's

---

[31]  *Booth v. State*, 251 P.3d 369, 375 (Alaska App. 2011) (defendant entitled to *in camera* review if defendant shows "that *if* the requested personnel files contain the sort of information described in the defendant's motion, this information would be relevant to the defendant's guilt or innocence" given facts and case theories); *see also March v. State*, 859 P.2d 714, 718 (Alaska App. 1993) ("As long as the party seeking discovery has a good faith basis for asserting that the materials in question may lead to the disclosure of favorable evidence, the trial court should conduct an *in camera* review before ruling on a request for discovery."); *Dana v. State*, 623 P.2d 348, 355 (Alaska App. 1981) (defendant must make a "sufficient showing to require the trial court to locate the personnel file in the middle of trial, review it *in camera*, and determine if any information had relevance").

[32]  *United States v. Henthorn*, 931 F.2d 29, 31 (9th Cir. 1991); *see also Milke v. Ryan*, 711 F.3d 998, 1016 (9th Cir. 2013).

[33]  *See, e.g.*, *Martin v. State*, 297 P.3d 896, 901 (Alaska App. 2013) (holding that trial court's refusal to grant an *in camera* production of personnel files was not plain error because whether defendant had to make an initial showing of materiality was reasonably debatable given federal circuit split on issue).

confidential personnel file. The State asserts that recognizing such a duty would impose "unacceptable burdens on prosecutors and the police."

Resolving the question of what duty, if any, a prosecutor has to learn of *Brady* material in a law enforcement officer's otherwise confidential personnel file is an issue of first impression for this Court. Our prior case law has not directly addressed whether such a duty exists, independent from the mechanisms through which a defense attorney can obtain *in camera* review of personnel files.

We begin our analysis with a brief overview of a prosecutor's general duty to disclose favorable material evidence under *Brady* and subsequent case law.

In 1963, in the seminal case *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[34] The Supreme Court subsequently clarified that a prosecutor's duty to disclose *Brady* material exists even when there has been no request from the defense.[35] The Supreme Court also expanded the duty to include impeachment evidence as well as exculpatory evidence.[36] Evidence is "material" for purposes of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[37]

---

[34] *Brady*, 373 U.S. at 87.

[35] *United States v. Agurs*, 427 U.S. 97, 107 (1976).

[36] *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

[37] *Bagley*, 473 U.S. at 682; *see Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (explaining that under *Bagley*'s "reasonable probability" standard, "[t]he question is not

(continued...)

The United States Supreme Court has also extended a prosecutor's duty to disclose *Brady* material beyond what is personally known to the prosecutor. Thus, in *Giglio v. United States*, the Supreme Court held that knowledge of a promise made to a witness by one prosecutor in the office was imputed to the trial prosecutor, even though the first prosecutor had never disclosed this impeachment information to the trial prosecutor nor to his superiors.[38] As the Court held, "[t]he prosecutor's office is an entity" and "[a] promise made by one attorney must be attributed, for these purposes, to the Government."[39] The Supreme Court recognized that this would likely place a burden on large prosecution offices, but it concluded that "procedures and regulations can be established to carry that burden and to [e]nsure communication of all relevant information on each case to every lawyer who deals with it."[40]

In *Kyles v. Whitley*, the Supreme Court held that the prosecutor's duty under *Brady* also extended to information outside the prosecutor's office, and included a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."[41] As in *Giglio*, the Court expressed confidence that

---

[37] (...continued)
whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence").

[38] *Giglio*, 405 U.S. at 154.

[39] *Id.*

[40] *Id.*

[41] *Kyles*, 514 U.S. at 437.

"procedures and regulations" could be established to ensure that prosecutors learn of favorable material evidence that should be disclosed to the defense.[42]

In response to *Brady* and its progeny, prosecutorial offices across the country have instituted procedures and regulations to ensure compliance with their constitutional duty to learn and disclose favorable material evidence to the defense.[43] In some instances, these procedures have included reviews of police personnel files for *Brady* impeachment material, which can include disciplinary actions related to a police officer's credibility and bias.[44]

For example, Maricopa County in Arizona requires law enforcement departments to provide prosecutors with police disciplinary files concerning "a law

---

[42]   *Id.* at 438 (quoting *Giglio*, 405 U.S. at 154).

[43]   *See* Jonathan Abel, Brady*'s Blind Spot: Impeachment Evidence in Police Personnel Files and the Battle Splitting the Prosecution Team*, 67 Stan. L. Rev. 743, 762-79 (2015) (reviewing a variety of state practices and approaches to implementing *Brady*); *see also, e.g.*, 2021 Wash. Sess. Laws, ch. 322 (requiring "[e]ach county prosecutor" to "develop and adopt a written protocol addressing potential impeachment disclosures pursuant to *Brady*").

[44]   *See, e.g.*, Franklin County District Attorney, *Press Release: Deeds Not Words* (Dec. 2, 2020), https://franklincountypa.gov/ckeditorfiles/files/District%20Attorney/ Press%20Release,%20Deeds%20Not%20Words,%2012_2_20.pdf (discussing policy requiring prosecutors "to promptly report any police misconduct they observe" and "*Giglio* Protocol" which "implements a local process for disclosure of police prior misconduct to defense counsel" and requires "ongoing maintenance of a list of such officers"); The Institute for Innovation in Prosecution at John Jay College of Criminal Justice, *The Prosecutor's Role in Addressing Officer-Involved Fatalities and Critical Incidents* 24-27 (2019), http://johnjay.jjay.cuny.edu/documents/Officer-Involved-Fatalities-Toolkit.PDF (providing example "Brady Policy" from Ramsey County, Minnesota that creates a *Brady* committee consisting of prosecutors, police officers, and others to disclose and track potential *Brady* material from the St. Paul Police Department on a monthly basis).

enforcement employee's truthfulness, bias, or moral turpitude."[45] Two counties in North Carolina similarly require "all police agencies to search officers' personnel records for credibility issues going back ten years."[46]

At the federal level, in 1991, the Department of Justice adopted an internal procedure to ensure that the personnel files of federal agents are reviewed for potential *Brady* material.[47] Under this system, each investigative agency within the Department's control is required to search agents' files for *Brady* material and to notify the prosecutor of anything that might require disclosure.[48]

These procedures were adopted by the federal government in response to a Ninth Circuit case, *United States v. Henthorn*.[49] In *Henthorn*, the Ninth Circuit held that "the government has a duty to examine personnel files upon a defendant's request for their production," and the "government must 'disclose information favorable to the defense that meets the appropriate standard of materiality.'"[50] The Ninth Circuit further held that "[i]f the prosecution is uncertain about the materiality of information within its possession, it may submit the information to the trial court for an *in camera* inspection

---

[45]    Abel, *supra* note 43, at 772-73 (internal citations omitted).

[46]    *Id.* at 774 (internal citations omitted).

[47]    *See id.* at 759.

[48]    *Id.*; *see also* United States Department of Justice, *Justice Manual* § 9-5.001(B) (2018) (requiring "federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all the members of the prosecution team," which includes "federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution").

[49]    *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991); *see* Abel, *supra* note 43, at 759.

[50]    *Henthorn*, 931 F.2d at 30-31 (quoting *United States v. Cadet*, 727 F.2d 1453, 1467-68 (9th Cir. 1984)).

and evaluation."[51]  Because the government had failed to examine the personnel files in *Henthorn*, the Ninth Circuit ordered the government to submit the files to the federal district court for *in camera* review.[52]

On appeal, Stacy argues that this Court should adopt *Henthorn*'s holding and require the State, upon defense request, to examine the personnel files of state agents, including the police, and disclose any *Brady* material found.  The State responds that the majority of federal circuits have rejected the *Henthorn* examination requirement and that this Court has likewise rejected this approach.

But the legal landscape is more complicated than the State acknowledges.  A year after *Henthorn* was decided, the Ninth Circuit grappled with the question of what "the duty to examine" actually meant.  In *United States v. Jennings*, the trial court interpreted *Henthorn* as requiring the prosecutor assigned to the case to *personally* review law enforcement officer personnel files.[53]  The trial court therefore issued an order requiring this personal review.  The government informed the court that it would decline to follow this order and would appeal.  In response, the court granted the defense request to suppress the testimony of the law enforcement officers.

On appeal, the Ninth Circuit reaffirmed the *Henthorn* holding that the government has a duty to examine law enforcement personnel files and to disclose any *Brady* material.[54]  The court held, however, that this duty could be met without requiring

---

[51]  *Id.*

[52]  *Id.* at 31.

[53]  *United States v. Jennings*, 960 F.2d 1488, 1489-90 (9th Cir. 1992).

[54]  *Id.*

the assigned prosecutor to personally review the relevant files.[55] The court noted that the Department of Justice had recently implemented a policy in response to *Henthorn* to ensure that *Brady* material contained in law enforcement personnel files was properly disclosed to the defense. The *Jennings* Court explained that, under this system,

> the files of law enforcement officers are to be examined by the appropriate agency's attorney or his staff. The agency legal staff will notify the federal prosecutor assigned to the case if any potential *Brady* material is found, and the AUSA will then determine whether the information should be disclosed or whether an in camera review by the district court is appropriate.[56]

The Ninth Circuit concluded that "[a]dherence to this procedure would indicate that the AUSA is fulfilling his responsibility for ensuring government compliance with *Brady*."[57] The court further concluded that the trial court had overstepped its authority in ordering the prosecutor to personally conduct a review because "the presumption is that official duty will be done" in accordance with the Department of Justice's internal policy.[58] The court therefore reversed the trial court's orders and remanded the case for further proceedings.

In our view, the Ninth Circuit's holding in *Jennings* strikes the appropriate balance between ensuring that the State complies with its duties under *Brady* while also granting the State the discretion to determine how best to comply. This approach has

---

[55]  *Id.* at 1491-92.

[56]  *Id.* at 1492 n.3.

[57]  *Id.* at 1492.

[58]  *Id.*

also been approved by other federal circuit courts — even courts that assert that they are rejecting *Henthorn*.[59]

In *United States v. Quinn*, for example, the Eleventh Circuit "decline[d] to follow *Henthorn*," but its actual holding reaffirmed one of the underlying principles of *Henthorn* — which is that the government has a duty to learn of *Brady* material that may be in a law enforcement officer's personnel file.[60] In *Quinn*, the defendant filed a pretrial motion requesting that the trial court order the government to disclose the personnel files of the testifying officers for impeachment purposes.[61] The trial court denied the motion, but nevertheless emphasized that the government had a duty to comply with its obligations under *Brady* and *Giglio*. As the trial court stated:

> As far as [personnel] records go, the government has to see if they're . . . *Brady* or *Giglio* . . . . Everybody knows that. . . . And I'm not going to tell the government what it has to do. One thing to clarify my position is that the government should be reviewing those records to determine whether this is *Brady* material at sight, not just to necessarily hand them over.[62]

---

[59] *See, e.g.*, *United States v. Dent*, 149 F.3d 180, 191 (3d Cir. 1998) (holding that, to satisfy *Brady*, prosecution "need only direct the custodian of the [personnel] files to inspect them for exculpatory evidence and inform the prosecution of the results of that inspection, or, alternatively, submit the files to the trial court for *in camera* review" (citing *Jennings*, 960 F.2d at 1492)); *United States v. Quinn*, 123 F.3d 1415, 1421-22 (11th Cir. 1997) (claiming to reject *Henthorn*, but concluding that the district court did not err by refusing to order *in camera* review of personnel records where district court had required the government "to review the personnel files to determine whether they contained *Brady* or *Giglio* material").

[60] *Quinn*, 123 F.3d at 1422.

[61] *Id.* at 1423.

[62] *Id.* at 1421.

The defendant later appealed the denial of his motion to compel, arguing that the trial court should have either ordered the government to directly disclose the contents of the personnel files to the defense or, at the very least, ordered the government to produce the files to the court for *in camera* review.[63] The Eleventh Circuit rejected this claim of error, concluding that the trial court had acted properly. As the Eleventh Circuit noted, "Here, the district judge required the government to comply with *Brady* and *Giglio*, and stated that the government was required to review the personnel files to determine whether they contained *Brady* or *Giglio* material."[64] Given this, the Eleventh Circuit concluded that the trial court had not erred in denying the defense request for production of those files absent an adequate showing of materiality.[65]

As the Eleventh Circuit's decision in *Quinn* demonstrates, there is a distinction between recognizing the prosecutor's duty to learn of *Brady* material in law enforcement personnel files and requiring the prosecutor to *produce* those files to the defense or to the court. However, this distinction is often lost in discussions of *Henthorn*, as is true in our prior discussion in *Martin v. State*.[66]

In *Martin*, the defendant filed a pretrial motion requesting that the trial court conduct an *in camera* review of the personnel files of all testifying officers.[67] In support of this motion, the defendant accused some of the officers of committing serious police misconduct in other cases. But he provided no support for these accusations. The trial court denied the motion, concluding that the defendant had failed to meet his burden of

---

[63]  *Id.*

[64]  *Id.*

[65]  *Id.* at 1421-22.

[66]  *Martin v. State*, 297 P.3d 896, 901 (Alaska App. 2013).

[67]  *Id.* at 900.

establishing "a good faith basis for asserting that the materials in question may lead to the disclosure of favorable evidence."[68]

On appeal, the defendant argued that the trial court's refusal to order *in camera* review of the personnel files violated his due process rights under *Brady*. Specifically, the defendant argued that "it is unreasonable to require a defendant to provide a good-faith basis for seeking disclosure of personnel files when the defendant does not have access to those files and does not know their contents."[69] The defendant had not made this argument in the trial court, and he was therefore obligated to establish plain error on appeal. In addressing the plain error argument, this Court cited to *Henthorn* and its progeny. But this Court also noted that "other federal circuits have rejected *Henthorn*,"[70] and we concluded that "the fact that the federal circuits are split on this question means that Martin has failed to show plain error."[71]

In the current appeal, the State relies on this language in *Martin* to argue that we have previously rejected *Henthorn* and that Alaska law therefore does not recognize any prosecutorial duty to learn about *Brady* material contained in law enforcement personnel files. But, as already established, there is a difference between a defendant's burden to justify production of otherwise confidential personnel files for an *in camera* review and the State's independent duty to disclose *Brady* material that may be in those personnel files. The State's duty to disclose *Brady* material was not at

---

[68]    *Id.* (quoting *March v. State*, 859 P.2d 714, 718 (Alaska App. 1993)).

[69]    *Id.* at 901.

[70]    *Id.*

[71]    *Id.*

issue in *Martin*, nor was it at issue in many of the cases cited in our opinion as rejecting *Henthorn*.[72]

Here, however, the State's independent duty is at issue. In the current case, the prosecutor took the position that because state personnel files are confidential under Alaska law, he had no ability to review them and no duty to learn about *Brady* material they may contain. But, as the Ninth Circuit explained, there are multiple ways that the State can comply with its obligations under *Brady* without having individual prosecutors personally review personnel files.[73] One approach is to adopt the federal system through which the affected agency conducts the internal review and then reports to the prosecutor's office.

---

[72] *See id.*; *see also United States v. Quinn*, 123 F.3d 1415, 1422 (11th Cir. 1997) (affirming denial of request to order production of personnel records but noting that district court properly required the government to examine those records for *Brady* or *Giglio* material); *United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir. 1992) (acknowledging *Brady*'s general obligation upon the government to disclose favorable evidence but noting that "the government typically is the sole judge of what evidence in its possession is subject to disclosure" and affirming denial of request for production of personnel records without a showing of materiality (internal citations omitted)); *United States v. Andrus*, 775 F.2d 825, 843 (7th Cir. 1985) (concluding that *Brady* does not require the government disclose or produce the contents of personnel files for review based only upon "speculative assertion[s] that impeaching material may be in a government file"); *cf. United States v. Kiszewski*, 877 F.2d 210, 216 (2d Cir. 1989) (remanding case for *in camera* examination of personnel files after prosecution reviewed the files of testifying officers and found potential impeachment material but did not disclose the files); *United States v. Muse*, 708 F.2d 513, 517 (10th Cir. 1983) (acknowledging that the "government must supply evidence useful to the defendant simply for impeachment purposes . . . whether such evidence was contained in personnel files or elsewhere" but denying disclosure of witnesses' personnel records where defendant had been granted disclosure of other impeachment material).

[73] *United States v. Jennings*, 960 F.2d 1488, 1490 (9th Cir. 1992) (noting that the government's duty to disclose *Brady* material "cannot be evaded by claiming lack of control over the files or procedures of other executive branch agencies").

Indeed, it appears that the Department of Law has adopted such a procedure with regard to the Anchorage Police Department. The Department of Law described this process in a trial court filing from an unrelated case, dated November 2016:

> The Anchorage Police Department (APD) and the Department of Law (DOL) have agreed to an on-going process by which the APD will advise one representative of the Department of Law of its substantiation of an officer's or employee's misconduct involving untruthfulness or bias. The APD gives the DOL representative limited detail about the misconduct, but does not give the DOL representative any written or recorded report of the investigation of the misconduct, such a report being part of a confidential personnel record. The APD furnishes the DOL representative with sufficient detail to show a judge assigned a criminal case in which the officer or employee may be a material witness that there is good cause to order production of the written or recorded report for *in camera* review. The process is intended to facilitate compliance with the duty of police and prosecutors under *Giglio* while respecting the officer's or employee's privacy interest in the confidential personnel records.[74]

Stacy referred to this policy in his briefing to this Court. The State, however, did not acknowledge or address it in its brief. But the apparent existence of such a policy undermines the State's claim that recognizing a duty to learn of *Brady* material in personnel files would impose "unacceptable burdens on prosecutors and the police."

Accordingly, we now hold that, under Alaska law, prosecutors have a duty to learn of *Brady* material that may be in the personnel files of law enforcement officers or other members of the prosecution team. We note that this duty extends not only to

---

[74] Motion for *In Camera* Review at 1-2, *State v. Beier*, No. 3AN-15-09578 CR (Alaska Super. Ct. Nov. 29, 2016).

police agencies of the same government bringing the prosecution, but it may also extend to officers from cross-jurisdictional agencies who have a "close working relationship" with the prosecution.[75] And the duty may include other governmental offices and actors who are "closely aligned with the prosecution" or acting on the government's behalf.[76]

---

[75] *See United States v. Brooks*, 966 F.2d 1500, 1503-04 (D.C. Cir. 1992) (holding federal prosecutor had duty to review personnel file of police officer who had been a key witness "[g]iven the close working relationship between the Washington metropolitan police and the U.S. Attorney"); *United States v. Antone*, 603 F.2d 566, 568-70 (5th Cir. 1979) (finding state investigators part of federal prosecution team because of "extensive cooperation" and formation of a "joint investigative task force" with federal agents).

[76] *See* United States Department of Justice, *Justice Manual* § 9-5.001(B)(2) (2018) ("prosecution team" includes "federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant"); *McCormick v. Parker*, 821 F.3d 1240, 1247 (10th Cir. 2016) (sexual assault nurse who examined alleged victim "at the behest of" law enforcement was part of the prosecution team); *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995) (finding Bureau of Prisons files to be within the prosecution's *Brady* obligation); *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985) (noting that prosecutor's ignorance of existence of favorable material does not justify the State's failure to produce it, particularly when the "withheld evidence is under the control of a state instrumentality closely aligned with the prosecution"); *United States v. Deutsch*, 475 F.2d 55, 57-58 (5th Cir. 1973) *overruled on other grounds by United States v. Henry*, 749 F.2d 203 (5th Cir. 1984) (holding that the government must produce personnel files of government agents if they contained impeachment material even if employee was employed by a different branch of the government — here, the personnel file of a post office employee who was the government's principal witness); *In re C.J.*, 652 N.E.2d 315, 318 (Ill. 1995) (observing that case worker from social service agency could be considered part of the prosecution team when the worker "acts at the behest of and in tandem with the [prosecutor], with the intent and purpose of assisting in the prosecutorial effort").

    *But see United States v. Rivera-Rodríguez*, 617 F.3d 581, 595 (1st Cir. 2010) (finding probation officer was not part of prosecution team when officer was preparing a presentence report for co-defendant and there was no evidence that prosecution had the information in the report prior to or during trial); *United States v. Pelullo*, 399 F.3d 197, 218 (3d Cir. 2005)

(continued...)

How the State chooses to comply with this duty is left to its discretion. But a system must be in place through which individual prosecutors can learn of *Brady* material in the personnel files of law enforcement officers and other state agents who will be material witnesses in a given case. Thus, when a defense attorney requests confirmation that the prosecutor has complied with their duty to learn of *Brady* material in a law enforcement officer's personnel file, the prosecutor must confirm that reasonable steps have been taken to discover and disclose any favorable material evidence contained in those files. This includes (but is not limited to) prior instances of police misconduct involving untruthfulness or bias.

The question we now face is how to remedy what has occurred in this case. Stacy argues that we should remand the case for an *in camera* review of all relevant personnel files and the trial court should then "disclose any relevant impeachment material it finds and determine if a new trial is warranted in light of any newly disclosed material." But this remedy ignores the distinction that Stacy has otherwise emphasized in his briefing before this Court — *i.e.*, the distinction between recognizing the prosecutor's duty to learn of, and disclose, *Brady* material in the personnel records of its agents, and actually requiring the personnel records to be subjected to an *in camera* review. We note that Stacy had the opportunity to request such a review in the proceedings below, and he failed to make a sufficient showing of materiality to warrant an *in camera* review. It is therefore not clear why he should be entitled to this relief on

---

[76] (...continued)

(finding Pension and Welfare Benefits Administration records outside prosecutor's constructive knowledge because agency had no working relationship with prosecution team); *United States v. Velte*, 331 F.3d 673, 680 (9th Cir. 2003) (no *Brady* violation despite failure to disclose report held by government weather station when no connection between prosecutor and weather station such that it was not "acting on the government's behalf").

remand. We also believe that it was *Henthorn*'s adoption of this type of remedy that led to the later misreading of that decision by other courts.

We conclude that the appropriate remedy is to remand this case to the superior court so that the prosecutor can properly fulfill their duty under *Brady*. On remand, the prosecutor shall ensure that the relevant personnel files have been reviewed for any impeachment evidence that is significant enough that it could be material in Stacy's case.[77] The prosecutor may also request the court to conduct some form of *in camera* review.

If impeachment evidence that could reasonably be viewed as material is discovered during the review, the evidence must be disclosed to the defense. The parties should then be given the opportunity to litigate whether a new trial is warranted in light of the newly disclosed evidence.

*Conclusion*

We REMAND this case for further proceedings as outlined above. We retain jurisdiction.

---

[77] Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" of a different result is one in which the withheld evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *accord Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *Banks v. Dretke*, 540 U.S. 668, 698-99 (2004); *Strickler v. Greene*, 527 U.S. 263, 290 (1999). A "showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," and it is "not a sufficiency of the evidence test." *Kyles*, 514 U.S. at 434. Courts consider the evidence "collectively, not item by item," and materiality "turns on the cumulative effect of all such evidence suppressed by the government." *Id.* at 421, 436.